861 So.2d 118 (2003)
STATE of Louisiana
v.
Thomas F. CISCO.
No. 2001-KA-2732.
Supreme Court of Louisiana.
December 3, 2003.
Rehearing Denied January 16, 2004.
*120 Marcia A. Widder, for Applicant.
Robert R. Bryant, Frederick W. Frey, Richard P. Ieyoub, Attorney General, David L. Kimball, Carla S. Sigler, Baton Rouge, for Respondent.
CALOGERO, Chief Justice.
The defendant has been convicted of three counts of first degree murder and sentenced to death by lethal injection. Because we conclude on direct appeal that the defendant did not knowingly and intelligently waive his right to conflict-free representation by appointed counsel, we reverse the convictions and sentence.

FACTS
Lake Charles attorney Evelyn M. Oubre represented Calcasieu Parish Deputy Sheriff Donald "Lucky" DeLouche and his wife in separate domestic matters, alternatively described as family law matters. Throughout the relevant time period of this case, Deputy DeLouche was the Director of the Violent Crimes Task Force (VCTF), an elite homicide investigation unit made up of law enforcement officers from the Calcasieu Parish Sheriff's Office, the Louisiana State Police, and area police departments.[1] Deputy DeLouche was the lead investigator for the July 6, 1997 killings of three people during an apparent armed robbery of KK's Corner, a convenience store located in Calcasieu Parish. DeLouche's investigation led to the arrest of Thomas Frank Cisco more than one year after the killings. Attorney Oubre was appointed to represent Cisco, who was later indicted for these killings; consequently, Oubre, as far as the record reveals, may have represented both the defendant and the State's primary prosecution witness from the time of the defendant's arrest, throughout trial, and until his conviction on three counts of first degree murder and his sentence to death. Therefore, this is a case in which an attorney appears to have simultaneously represented both the accused and his accuser, and the issue presented is whether the accused's waiver of his Sixth Amendment right to conflict-free counsel was knowing and intelligent.[2]
The particulars of Oubre's representation of Deputy DeLouche and his wife are not known.[3] Oubre described the DeLouches' cases only as family law matters without apparently providing the court or the defendant with additional information. Nor did Oubre state whether her representation of DeLouche and his wife was *121 ongoing, although DeLouche himself, in a deposition in a civil suit against the sheriff's office arising out of the killings, indicated that Oubre was his personal counsel well after she had been appointed to represent the defendant.[4] While Oubre did not disclose to the district court any of the particulars regarding her representation of the DeLouches, a member of the local defense bar, Thomas Lorenzi, was sufficiently alarmed about Oubre's dual representation of the defendant and the lead investigator that he wrote a letter, dated October 9, 1998, to the district court outlining his concerns. This attorney stated to the district court that Deputy DeLouche's domestic file in the district court had been placed under seal, thus Oubre could not have fully explained potential conflicts to the defendant unless she had obtained an order either unsealing the record or relieving her from the obligation not to disclose. This attorney further stated that information known to the defense bar was that the pleadings in DeLouche's domestic case were placed under seal because there had been allegations of criminality made against him. The record does not indicate that this letter or its contents were ever disclosed to the defendant. Moreover, though Oubre and the district court were surely aware of the letter,[5] Oubre did not respond to the letter's contents on the record, and the district court never inquired of Oubre or anyone else as to the contents of the letter.[6]
Nonetheless, the record does reveal the depth and extent of Deputy DeLouche's involvement in the case against the defendant. DeLouche and the Task Force to this day believe that more than one person committed the murders at KK's Corner in Calcasieu Parish, but only the defendant has ever been arrested for the offense. Because there was no physical evidence linking the defendant or anyone else to the crime scene, the State's case, alleging that the defendant was either the shooter or at least a principal to the murders, rested on the defendant's multiple statements, some nineteen of which were introduced at trial and which contained numerous and contradictory assertions at odds with key facts known to the Task Force. The majority of these statements, and certainly the most damning of them, were secured by Deputy DeLouche alone or at his direction, all while Oubre apparently represented both DeLouche and the defendant. Although the defendant identified other people in some of his inculpatory statements as co-perpetrators, as DeLouche himself explained to the district attorney at trial, no one else has ever been arrested because *122 the defendant's "word aloneas you see, he's changed the statement so many times, I wouldn't feel comfortable arresting anybody without some corroborating evidence other than his own word."
The State's case against the defendant also rested on the testimony of Virginia Johnson, who unexpectedly identified the defendant in a physical line-up conducted by Deputy DeLouche in defense counsel's absence on the day she was first appointed, and thereby placed the defendant on the scene. Johnson had never before been able to give a detailed description of the second of two men she had seen entering the convenience store where the murders later occurred, but she nonetheless identified the defendant as that man at the line-up conducted by Deputy DeLouche. She also recalled, for the first time, that the second man had a tattoo on his left hand, when she saw tattoos on both of the defendant's hands at the line-up.
The defense theory of the case was that the defendant had given these false confessions because he lacked a mature and established self-identity, and, therefore, he was easily influenced by persons in authority and, chameleon-like, would say anything in an effort to please whomever he was with. The defendant's mental disorder, according to defense experts who testified in the guilt-innocence phase of trial, arose out of his turbulent upbringing and his long-term substance abuse, beginning when he was six years old. The defense also extensively challenged the reliability of Ms. Johnson's identification, pointing out the various inconsistencies in her statements to police, one of which was conducted under hypnosis.
With that preface in mind, we turn to the facts of this rather complex case, particularly as they relate to DeLouche's involvement in the investigation of these murders and defense counsel's efforts to obtain a waiver from the defendant regarding her apparently simultaneous representation of him and DeLouche.[7]
In the early morning hours of July 6, 1997, three people, Stacie Reeves, Marty Lebouef, and 14-year-old Nicole Guidry, were killed during the apparent armed robbery of KK's Corner, a convenience store and gas station located near the corner of Tom Hebert Road and Highway 14 in Calcasieu Parish. The victims, whose bodies were found in the store's cooler, were each shot multiple times, and the killers had taken particular and specific measures so as to leave no physical identification evidence at the scene, including the cutting of telephone lines and the removal of a surveillance video-tape from the store's locked office. Consequently, the tragic crime went notoriously unsolved for over a year, and the efforts of DeLouche's Task Force to find the murderers were extensive and well-publicized, with hundreds of people interviewed, the Federal Bureau of Investigation called in to assist, and substantial rewards offered by Crimestoppers ($10,000.00) and then Calcasieu Parish Sheriff Wayne McElveen (up to $100,000.00).
As set forth previously, Deputy DeLouche was the lead investigator for the VCTF and an indispensable witness for the State at trial. Nearly one year after the crime was committed, Deputy DeLouche and the VCTF began to investigate Thomas Frank Cisco, who had been a *123 friend of one of the victims.[8] During the questioning of the defendant by FBI agents in May of 1998, the defendant, though generally denying involvement, made some suspicious claims or statements.[9] More than three months later, FBI agents re-interviewed the defendant, informing him that his claim of having been in Metairie the entire 4th of July weekend in 1997 could not be verified.[10] After five and half hours during which the defendant gave four different, diverging statements about the crime, ranging from no involvement to pointing the finger at a Robert Thigpen as the shooter, the defendant made a written statement implicating himself and Thigpen in the crime.[11] The defendant, who had admitted to having seen the America's Most Wanted broadcast on the murders and was occasionally emotional, gave conflicting, and at times false, details about his participation in the crime. Though he was warned that he would be placed under arrest in Lake Charles, the defendant agreed to be transported by FBI plane to Deputy DeLouche and the Task Force in Lake Charles.
Deputy DeLouche and members of his team met the defendant around 11:00 p.m. on August 26, 1998, at which time DeLouche and the defendant, who had known each other in the past, caught up on what they had been doing since. The defendant then directed DeLouche to places he had supposedly visited the weekend of the crime, pointing out the bus station at which he had arrived in Lake Charles from *124 New Orleans and attempting to locate the home of Robert Thigpen, where they had allegedly planned the robbery. However, the bus station the defendant directed them to had not been in operation in July of 1997, and the defendant was never able to identify Thigpen's home even when DeLouche took him to that particular street. When these errors were pointed out to the defendant, DeLouche, questioning the defendant himself, secured yet another inculpatory statement from the defendant, which lasted until 2:30 or 2:45 in the morning and which still fingered Thigpen as the shooter. Thereafter, the defendant was placed under arrest for armed robbery and taken to the DeQuincy jail.
The next day, DeLouche and his team located Thigpen, whose wife and her sister had taken victim Nicole Guidry to KK's Corner the evening of the crime to leave her with Stacie Reeves. Thigpen, whose appearance, according to DeLouche, did not fit Johnson's description of the first man she had seen at the store, provided an alibi that DeLouche deemed firm. That day, in a series of interviews, DeLouche's team accused the defendant of either minimizing his involvement in the crime, covering for someone else, or making the whole thing up because of his feelings of inadequacy. The defendant then asked to speak to DeLouche alone in order to tell the truth, but when the defendant denied any involvement in the killings, DeLouche told the defendant he was not "man enough" and did not have "the guts" to admit his involvement. The defendant ultimately claimed this time that he had done the crimes by himself.
However, at this point, the defendant began indicating that he might need an attorney. After consulting with the district attorney, DeLouche returned to the defendant to clarify the invocation of counsel, but DeLouche nonetheless obtained the defendant's agreement to take DeLouche to the hotel where the defendant had stayed while in Lake Charles in September of 1996 doing work for his then employer.[12] Thereafter, arrest warrants were prepared, and the defendant was taken to the Calcasieu Parish jail, where he was apparently placed in isolation.[13]
On August 30, 1998, the defendant asked to talk to DeLouche, who declined until the following day, August 31st. In the defendant's cell, DeLouche agreed to help the defendant obtain medication and perhaps be returned to the general population and be allowed to smoke cigarettes. During this conversation, the defendant again admitted involvement in the robbery and murders. DeLouche then asked the defendant about the gun and the missing videotape and whether the defendant would accompany him to the New Orleans area to show where the defendant had disposed of these items. However, later that day, the defendant again asked to speak with DeLouche, who sent other Task Force members to question the defendant, at which time the defendant recanted his previous inculpatory statements. Once again, the district attorney was consulted, and DeLouche was instructed to obtain another statement, which he *125 did, resulting in another video-taped inculpatory statement.
On September 1, 1998, the court appointed attorney Oubre to represent the defendant; however, Oubre stated she was then on vacation and did not return to her office until a week later. Nonetheless, on September 1, 1998, when she was informed of the appointment, counsel left a message with the district attorney requesting that the line-up requested by DeLouche be postponed until she could be present. DeLouche, meanwhile, had already obtained the defendant's permission to proceed without Oubre's presence. As DeLouche told the jury at trial, he conducted a physical line-up on September 1, 1998, at which Virginia Johnson unexpectedly identified the defendant as the man who had bumped into her at the convenience store. DeLouche related to the jury how Johnson was surprised that she could identify the defendant but that she was certain it was he. Johnson at trial described how she came to make the identification of the defendant at this line-up.
Defense counsel Oubre indicated that she first spoke to the defendant on September 14, 1998. Two days later, on September 16, 1998, having immediately recognized at least the potential for conflicting interests caused by her dual representation of the defendant and Deputy DeLouche, counsel sent the defendant a letter in which she vouched to the defendant that she did not have a conflict because of her representation but nevertheless left it up to the defendant to determine if she did and whether he wanted to continue with her representing him.[14]
At a hearing on September 24, 1998, prior to the defendant's arraignment, defense counsel brought the matter to the attention of the trial court, telling Judge Godwin:
The Violent Crimes Task Force was the agency that investigated the case. The chief of that office is Mr. Lucky DeLouche, whom I represent in family court matters, as well as his wife. Also on the Violent Crimes Task Force is Mr. Victor Salvador, who I also represent in family court matters. I have explained this to [the defendant], I have explained *126 it to Mr. DeLouche and Mr. Salvador. I have prepared a written document for [the defendant] to sign. He has signed it. I have gone back over it with him again this morning, explained to him the potential conflict, although I do not see one, and according to the code of professional conduct, I do not see one, I want to be absolutely cautious and I want to do what [the defendant] requests of me. And it is my understanding as of still this morning [the defendant] desires that I remain as his lead counsel.
The trial judge then asked whether the defendant had read and understood Oubre's letter, and the defendant responded that he had. In attempting to explain a conflict of interest and how counsel's performance could be affected, the trial judge stated, "I can't sit here and think of a lot of different ways that some conflict can come up," but the judge did note that defense counsel was obligated to cross-examine Deputy DeLouche and bring out whatever she could that was helpful to the defendant's case. When informed that DeLouche would testify, the court again cursorily outlined a possible consequence of Oubre simultaneously representing both Deputy DeLouche and the defendant:
[Court]: There is thethere is at least the potential, or the concern, for example, that you may at some point have some feelings that [defense counsel], because she represents Mr. DeLouche personally, isn't being as aggressive as you think she ought to be, or isn't pushing as much as she oughtI don't know, I'm justthat's just one little way it could come up that wouldthat's what we call conflict.
[Def]: Right.
[Court]: As to whetheras to whether there's any concern that her duty to you to befully assert all your rights is going to be held back in any way because of any relationship or duty client relationship she has with DeLouche. And the same goes for Mr. Salvador. And I can't sit here and forecast all the different little ways that something may come up there, but that's what we're talking about, is something like that. This letter [from Oubre to the defendant seeking a waiver] that we're talking about here uses the term conflict and everything, and I'm trying to flesh it out for you, for you to pictureso, do you see all of that?
[Def]: Yes, sir, I understand.
Additionally, the court determined that the defendant quit school in the eleventh grade, and sounded "articulate and able to understand" the proceedings around him. The court then ruled that defense counsel could continue to represent the defendant. Notably, the trial judge, as had defense counsel, effectively left it to the defendant to decide for himself whether an actual conflict of interest existed because of Oubre's dual representation of the defendant and Deputy DeLouche.[15]
*127 The issue of Oubre's dual representation arose just three weeks later on October 13, 1998, when the defendant was arraigned before a different judge. After the defendant entered pleas of not guilty, Oubre asked the court, Judge Minaldi, what it proposed to do with attorney John LaVern, the second chair appointed to the defendant's case, because of a conflict. Judge Minaldi stated that Judge Godwin had told her that his inquiry into both Oubre's and LaVern's conflicts had been brief. Judge Minaldi further stated that "it may be a better idea for me, at some point, to go into a more lengthy discourse with Mr. Cisco about what he understands about the conflict and put more of that on the record." Judge Minaldi opined that to have a hearing "may be required under [Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ]," and that she wanted to "make sure that is done adequately ...." Judge Minaldi, however, stated that she believed there was a problem with LaVern continuing to represent the defendant, yet, even though she had not conducted a hearing, Judge Minaldi was "confident" that there would be no problem with Oubre's continued representation of the defendant. LaVern withdrew three days later on October 16, 1998.[16] There is no indication in the record that Judge Minaldi ever conducted a hearing to determine either the particulars of Oubre's representation of DeLouche and his wife or what the defendant understood about Oubre's conflict of interest arising out of her dual representation of both him and Deputy DeLouche.
For the next few months, apparently on counsel's advice to the defendant, DeLouche and the defendant had no further contact. However, the defendant on January 20, 1999, sent a message to Deputy DeLouche that he wanted to talk to him. Although DeLouche first sent other Task Force members to talk to the defendant, including Vic Salvador whom Oubre also represented, DeLouche eventually visited the defendant in his cell, where the defendant complained of being in isolation and wanted medication for depression. After DeLouche promised to help him, the defendant wondered if they should tell his counsel about the meeting, but decided to tell her later when DeLouche said it was up to the defendant whether to do so. The defendant then proceeded to make another statement, the eleventh one so far, this time saying that three people were involved in the killings: the defendant and two others named Malcolm and Bobby. The defendant also agreed that he would accompany DeLouche to the New Orleans area where the defendant allegedly tossed the gun from the Causeway Bridge into Lake Pontchartrain and destroyed the videotape in an area near the Bonnet Carre Spillway.
On January 27, 1999, Deputy DeLouche and other members of the Task Force picked up the defendant to take him to LaPlace. When he was asked about telling Oubre, the defendant said it was not necessary and that she would not go anyway. *128 Out at the Bonnet Carre Spillway, the defendant made additional inculpatory statements on tape, including that he was the shooter, but also saying that there was a fourth person involved. The next day, January 28, 1999, the defendant wrote another letter to Deputy DeLouche, which was immediately delivered to DeLouche by Russell Fleig, the jail chaplain. On January 29, 1999, the defendant was taken to Deputy DeLouche, who secured another statement from the defendant, this time saying that the fourth person, Chris Cabral, had actually been involved in the robbery and murders.
On January 29, 1999, Deputy DeLouche also secured the defendant's signatures on two waivers of confidentiality privileges he had with Chaplain Fleig, who had been counseling the defendant since November of 1998, and the jail's medical director, Dr. Terry Welke, who was also the coroner who performed the autopsies on the three victims and who had prescribed the anti-depressant medication sought by the defendant. Fleig testified at trial that the defendant on January 28, 1999, stated he wanted to tell Fleig about what happened and to tell the Task Force everything he had said. Fleig related that the defendant admitted to shooting the victims and explained that he and three other men had come to Lake Charles from New Orleans to buy cheaper drugs. Eventually, in March of 1999, the defendant stopped meeting with Fleig. As for Dr. Welke, at some point prior to January 29, 1999, he had an occasion to question the defendant before prescribing him an anti-depressant. Dr. Welke testified at trial that the defendant told him that he had shot the victims and explained that he had done so trying to get money for drugs.
On March 18, 1999, the defendant told Deputy Corey Manuel, who worked at the jail, that he wanted to talk to him and that the statement could be recorded. After directly communicating this information to Deputy DeLouche, Manuel was provided with a tape recorder and waiver of rights form, and instructed in how to record the defendant's conversation. To Manuel, the defendant stated that the son of then Sheriff Wayne McElveen, Richard McElveen, had paid the defendant $10,000 out of a promised $20,000 to kill Stacie Reeves, because she knew too much about how her former boyfriend, Kevin Abel, had been killed in a drug-related matter in which McElveen was involved. There had been previous allegations that drugs were being trafficked out of KK's Corner and that Abel owed Richard McElveen or other dealers a large sum of money. The Sheriff's Office, however, had deemed Abel's death a suicide, which Reeves, according to a friend who testified at trial, did not believe was true. The defense attempted to portray this statement to Manuel, in light of the wild rumors circulating through the jail and the local community about Richard McElveen, as another example of the defendant's many false confessions.
In May of 1999, the defendant made another inculpatory statement in a letter he wrote to a former girlfriend, Sharon Latino, stating that the defendant was going to take what was coming to him like a soldier. However, the defendant denied involvement in the numerous letters and telephone calls he made to Latino both before and after his letter of May 3, 1999.
On May 19, 1999, the defendant made still another inculpatory statement to Deputy Christina Lyons, a jailer at the Calcasieu correctional center, who was instructed by Deputy DeLouche to record the defendant's conversation without his knowledge. DeLouche knew that the defendant had been speaking to Lyons on a regular basis when she escorted him from *129 isolation into the recreation yard. In the recorded statement given in the recreation yard, the defendant made inculpatory statements about being involved in the crime, discussed the upcoming sheriff's election, and referred to himself as a hero. Lyons explained at trial that the defendant had been placed in isolation after contacting a television station from a telephone inside the jail.
On November 8, 1999, over a year after both Judge Godwin and Judge Minaldi had been made aware of the issue of Oubre's dual representation of DeLouche and the defendant, but still nearly a year before trial, counsel Oubre mentioned in open court before Judge Minaldi that the defendant had made several written allegations of collusion between her and Deputy DeLouche.[17] Believing that she had questioned the defendant previously about "this" at the beginning of the case and that the defendant had assured her that he wanted Oubre to remain as his counsel, Judge Minaldi, obviously agitated by the development, wanted to know what had since happened to change the defendant's mind. When informed that there were letters written by the defendant making allegations of collusion, the court, with both Oubre and DeLouche present in the courtroom, asked the defendant if he had "any doubts about whether [he] want[ed Oubre] to continue to represent [him.]" The defendant stated that he had none. The court then asked the defendant if he still wanted defense counsel to represent him, to which he replied that he did. The judge, however, made no inquiry of the defendant regarding his allegations of collusion and what may have caused him to believe that Oubre and DeLouche were plotting against him.
Eleven months later, the case went to trial in Calcasieu Parish, with a jury empaneled from an East Baton Rouge Parish jury pool. On October 9, 2000, testimony began. The trial ended nine days later with a guilty verdict and a sentence recommendation of death by lethal injection. The trial court subsequently sentenced the defendant in accordance with the jury's recommendation, and the instant capital appeal followed.

DISCUSSION
On appeal, the defendant claims that Oubre labored under a conflict of interest, in that, at or around the time of trial, Oubre represented "Lucky" DeLouche in what defense counsel alternately termed "an unrelated civil matter" or "a family law matter." Defense counsel also represented DeLouche's wife in what counsel referred to as a "separate family law matter."
The right of a criminal defendant to the assistance of counsel during the proceedings against him is a cornerstone of our legal system. State v. Franklin, 400 So.2d 616, 620 (La.1981). "To be more than just a hollow right, our law requires that assistance of counsel be effective." Id. As a general rule, therefore, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant she is representing. Id.
The issue of conflicting loyalties usually arises in the context of joint representation, but it can also arise "where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney." State v. Tart, 94-0025, p. 19 (La.2/9/96), *130 672 So.2d 116, 125; State v. Kirkpatrick, 443 So.2d 546, 552 (La.1983). In a pretrial context, regardless of how the conflict of interest issue arises, the trial court has two options to avoid a conflict of interest: appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel. Tart, 94-0025 at 19-20, 672 So.2d at 125 (relying on Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); State v. Edwards, 430 So.2d 60, 62 (La.1983); State v. Marshall, 414 So.2d 684, 687-88 (La.1982). Failure to do one or the other in a case in which an actual conflict exists requires reversal. Holloway, 435 U.S. at 480, 98 S.Ct. at 1181; State v. Carmouche, 508 So.2d 792, 805 (La.1987) (on reh'g). As we stated in Franklin, 400 So.2d at 620, "If an actual conflict exists, there is no need for a defendant to prove that he was also prejudiced thereby."[18] Accordingly, in this case we are called upon to determine whether an actual conflict of interest existed and, if so, whether the defendant knowingly and intelligently waived his right to conflict-free counsel and whether the trial court took adequate steps to assure that defendant was afforded the very important requisite that the defendant's representation be conflict free.

CONFLICT OF INTEREST
This court in State v. Kahey, 436 So.2d 475, 485 (La.1983), defined an actual conflict of interest as follows, accepting the definition set forth in Zuck v. Alabama, 588 F.2d 436, (5th Cir.1979), cert denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979):
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.
This court has consistently held that a defense attorney required to cross-examine a current or former client on behalf of a current defendant suffers from an actual conflict. See, e.g., State v. Carmouche, 508 So.2d at 804; Franklin, 400 So.2d at 620 ("[W]e must agree with the defendant's attorney, and with the trial judge, that an actual conflict arose when the state called [counsel's former client] to the stand. [Counsel] was put in the unenviable position of trying zealously to represent the defendant at trial while simultaneously trying to protect the confidences of a former client who was testifying for the state against the defendant."); see also Dane S. Ciolino, ed., Louisiana Rules of Professional Conduct, Rule 1.7 comment 3 (L.S.B.A.2001) ("As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent.").
In Carmouche, a capital case in which this court reversed the conviction and sentence of death, we applied Kahey and Zuck v. Alabama and concluded that the defendant's counsel was confronted with an actual conflict of interest when another of his clients was arguably the most damaging prosecution witness against the defendant. There, the defendant's counsel was served on the last day of trial with notice that the State intended to introduce inculpatory statements the defendant had allegedly made to a jail cellmate, who had agreed to testify only the day before. In objecting *131 to the timing of the notice, counsel also noted the possibility of a conflict of interest because he was also representing the prosecution witness in an unrelated criminal matter. Counsel did not, however, not seek to be relieved of representation, request a recess for developing impeachment evidence, or move for a mistrial, and the witness proceeded to take the stand to give damning evidence against the defendant. Nonetheless, in determining whether counsel was faced with a conflict of interest, we held that counsel's statement was sufficient to alert the trial court that an actual conflict existed and that counsel could have felt required to balance the competing interests of his two clients. Carmouche, 508 So.2d at 804. We then noted that, once a conflict of interest is deemed to exist, it is presumed that the conflict will affect defense counsel's performance. Id. at 805. We eventually went on to conclude in Carmouche that the trial court failed to take adequate steps to protect the defendant's Sixth Amendment right to conflict-free counsel, necessitating the reversal of his conviction and sentence. Id.
In the instant case, we find that a similar result is mandated, primarily because the record is silent as to the particulars of defense counsel's representation of Deputy DeLouche and his wife. Even though counsel herself made the unsupported assertion that she was not under a conflict of interest, she obviously felt sufficiently concerned about her dual representation of the prosecution's leading witness and the defendant both to bring it to the attention of the trial court and to obtain, in advance of appearing in court, a written waiver from the defendant himself. The trial court, Judge Godwin, also recognized a conflict of interest in defense counsel's simultaneous representation of the defendant and one of the two most important prosecution witnesses in the State's case. However, perhaps relying too heavily on counsel's unsupported assertion, neither Judge Godwin nor Judge Minaldi took adequate steps on the record to determine whether counsel's conflict of interest was too remote to warrant the appointment of different counselsuch as inquiring of counsel as to the particulars of her representation of Deputy DeLouche and his wife. Instead, Judge Godwin, without any specific knowledge of counsel's representation of Deputy DeLouche and his wife, and thus unable to inform the defendant adequately of the conflict under which his appointed counsel labored and of how her representation of him could be negatively affected, nonetheless attempted to obtain from the defendant a knowing and intelligent waiver of his right to conflict-free counsel. Additionally, it appears from the record that Judge Minaldi's efforts were similarly inadequate to protect the defendant's rights, such as inquiring into the particulars of counsel's representation of Deputy DeLouche and his wife and explaining fully to the defendant his counsel's conflict of interest, because the record does not establish that the hearing under Wheat, which she herself stated was necessary, had ever been conducted.[19]
In our view, then, given that two judges recognized that a waiver of conflict-free counsel was required on account of appointed counsel's dual representation of the defendant and Deputy DeLouche, and given that appointed counsel's other client, *132 Deputy DeLouche, was one of the most important identity witnesses against the defendant, i.e., the head of the investigative task force who would be testifying at trial as to the defendant's various inculpatory statements connecting him to the scene of the crime in the absence of physical evidence, the only reasonable conclusion we can reach based on the record before us is that counsel was necessarily confronted with an actual conflict of interest when she was called upon to cross-examine her client Deputy DeLouche at the trial of her other client, the defendant. WAIVER and PROTECTION OF THE DEFENDANT'S RIGHTS
After the court has been alerted that an actual conflict of interest exists, the judge must take the proper steps to assure that the defendant's Sixth Amendment right to effective assistance of counsel is not violated. Carmouche, 508 So.2d at 804. As noted above, when a defendant raises the issue of a conflict of interest prior to trial, the judge is required either to appoint other counsel or to take adequate steps to determine whether the risk of a conflict of interest is too remote to warrant other counsel. State v. Edwards, 430 So.2d 60, 62 (La.1983) (quoting Holloway v. Arkansas). Those steps were set forth in Carmouche, wherein we determined that the judge, while being mindful of the restrictions inherent in the attorney/client privilege, should first require the attorney to disclose the basis of the conflict. 508 So.2d at 805. Then, "[i]f the judge determines that the conflict is not too remote, he should explain the conflict to the defendant ... and inform the defendant of his right to representation that is free of conflict." Id. Thereafter, if the defendant chooses to proceed with conflicted counsel, "a statement should be prepared in narrative form, which indicates that the defendant is fully aware of his right [to conflict free counsel] but has chosen to make a knowing and intelligent waiver thereof. Id. (citing United States v. Winkle, 722 F.2d 605 (10th Cir.1983), and United States v. Martinez, 630 F.2d 361 (5th Cir.1980)); see State v. Odle, 02-0226, pp. 19-20 (La.App. 3d Cir.11/13/02), 834 So.2d 483, 497; State v. Sartain, 98-0378, pp. 11-12 (La.App. 4th Cir.12/1/99), 746 So.2d 837, 846; see also United States v. Schwarz, 283 F.3d 76, 95 (2d Cir.2002); United States v. Kliti, 156 F.3d 150, 153 (2d Cir.1998).
We stress the importance of the trial judge's protecting the defendant's Sixth Amendment rights, even if a defendant expresses a desire to proceed with conflicted counsel. Because courts "possess an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all that observe them[,]" Wheat v. United States, 486 U.S. 153, 160, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988), the defendant's ability to waive certain conflicts is not unfettered.[20]Id. For example, in United States v. Fulton, 5 F.3d 605, 612 (2d Cir.1993), the court stated, "When a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or jeopardize the federal court's institutional interest in the rendition of a just verdict, a trial judge has discretion to disqualify an attorney or decline a proffer *133 of waiver." Nonetheless, a trial court ruling on potential conflicts when raised pretrial is entitled to broad discretion, regardless of whether the court permits or refuses enrollment of potentially conflicted counsel after a valid waiver. Wheat, 486 U.S. at 164, 108 S.Ct. at 1700.
This court has previously set forth the requirements for a knowing and intelligent waiver of the right to counsel unburdened by a conflict of interest. Before a defendant can knowingly and intelligently execute a valid waiver of conflicted counsel he must be told (1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel. Sartain, 98-0378 at 12, 746 So.2d at 846 (citing State v. Castaneda, 94-1118, p. 5 (La.App. 1st Cir.6/23/95), 658 So.2d 297, 301)); see also United States v. Garcia, 517 F.2d 272, 276 (5th Cir.1975); State v. Salinas, 97-0716, p. 5 (La.App. 3d Cir.10/29/97), 703 So.2d 671, 674; Duncan v. Alabama, 881 F.2d 1013, 1017 (11th Cir.1989).[21]
Applying the waiver requirements to the instant case, we find the waiver was not knowingly and intelligently entered into, nor did the trial court adequately facilitate such a waiver by ensuring that the defendant was fully informed of the consequences of proceeding with conflicted counsel. As to the first requirement, the defendant did have notice that a potential conflict of interest existed. However, as discussed below, the defendant was clearly left on his own in determining whether an actual conflict of interest existed. The defendant was, troublingly, presented with contradictory viewpoints. On one hand, the defendant's primary attorney was insisting there was no conflict of interest. On the other hand, the trial court apparently recognized that there might be a conflict of interest, but took no steps to inquire of counsel as to the particulars of her representation of the prosecution witness and his wife, nor for that matter her representation of the other VCTF detective, other than to accept at face value counsel's statement that the representations of DeLouche and his wife were separate family matters.
As to the second requirement, the court explained one of the potential consequences of continuing with current defense counsel when it addressed some of the potential problems counsel might have cross-examining one of her clients in an attempt to gain acquittal of the defendant. However, in her letter to the defendant seeking a waiver of his right to conflict-free counsel, Oubre expressed the unsupported conclusion that her representation created no conflict of interest. At no time did counsel shed any light on the nature of her representation of either DeLouche or his wife other than to say that it was in "separate family law matters."[22] *134 The district court made no inquiry of counsel regarding the nature of the matters in which she represented DeLouche and his wife. Nor did the district court ever inquire of counsel as to the substance of the Lorenzi letter. Moreover, although at the arraignment on October 13, 1998, the district court acknowledged that going "into a lengthy discourse with [the defendant] about what he understands about the conflict and put[ting] more of that on the record ... may be required under Wheat [,]" the court never engaged in such discourse with the defendant. Consequently, despite the fact that DeLouche's significant involvement in the defendant's case was readily apparent each time the defendant purportedly waived any conflict of interest counsel Oubre had because of her dual representation of DeLouche and the defendant, neither Judge Godwin nor Judge Minaldi had taken appropriate steps to put themselves in a position to inform the defendant of the true nature of his counsel's conflict and any effects it could have on counsel's representation and her defense of his rights.
Finally, as to the third requirement, that the defendant be informed that he has a right to obtain other counsel, the record does not reflect that he was ever so informed. Notably, in the letter seeking a waiver from counsel Oubre to the defendant, the choice counsel presents is whether he wishes to continue with her representation or not. Oubre's letter makes no mention of the court appointing other counsel in the event that the defendant did not want her to continue representing him. Likewise, at the September 24, 1998 hearing, the trial court mentioned only a potential peril of proceeding with conflicted counsel; it failed to set out any alternatives for the defendant to consider. At arraignment on October 13, 1998, the trial court did not even engage the defendant in a colloquy much less advise him of his right to be appointed conflict-free counsel. The trial court again failed to make such an advisement in November of 1999, when the defendant's allegations of collusion between DeLouche and Oubre surfaced.
Finally, we note that had the defendant decided to exercise his right to conflict-free counsel, the trial judge in this particular case could have taken a number of simple steps to safeguard the defendant's Sixth Amendment rights. See Carmouche, 508 So.2d at 806, Lemmon, J., concurring on reh'g. In the instant case, for example, the trial judge could have easily appointed another attorney to represent the defendant, since on each occasion when the issue arose trial would not transpire for many months or years in the future.[23] Alternatively, the trial judge could have ensured that the cross-examination of Detective DeLouche was conducted by the "second chair" attorney, who was not similarly conflicted.
Conflicts of counsel, whether actual or potential, as well as unknowing waivers of conflicted counsel, take a heavy toll on the integrity of our judicial system and the public's confidence in the bench and bar. Because the record in this case does not establish that the defendant knowingly and intelligently waived his right to the assistance *135 of conflict-free counsel, we reverse the defendant's convictions and sentence.

DECREE
For the reasons set forth above, the defendant's convictions and sentence are reversed, and the case is remanded to the district court for a new trial and the appointment of defense counsel.
REVERSED AND REMANDED.
VICTORY, J., dissents and assigns reasons.
VICTORY, J., dissenting.
I dissent from the majority opinion because it appears to me the defendant clearly waived any potential conflict in this case. Therefore, I would either conditionally affirm the convictions and sentence and remand the case to the trial court to determine whether an actual conflict existed and whether the defendant validly waived the conflict, or, affirm the convictions and sentence and relegate the defendant to post-conviction proceedings.
Therefore, for the above stated reasons, I respectfully dissent.
NOTES
[1] The VCTF was disbanded in July of 2000 following the election of a new sheriff in Calcasieu Parish.
[2] Because we reverse the defendant's convictions and sentence of death on this ground, we pretermit discussion of the defendant's other assignments of error.
[3] Oubre also represented another sheriff's deputy member of the investigation team, Vic Salvador, though he did not testify at trial against the defendant.
[4] Ellis LeBouef, the father of victim Marty LeBouef, had sued the Calcasieu Parish Sheriff's Office and the owner of the convenience store, among others, for their failure to respond appropriately to the security company's notification that the alarm at the store had not been set after closing time.
[5] Prior to allotment of the case to Judge Minaldi, Judge Godwin presided over the hearing of September 24, 1998, at which the issue of counsel's conflict of interest was first raised. According to Lorenzi's affidavit of December 19, 2002, Judge Godwin assured him that he had forwarded the letter to Judge Minaldi.
[6] We must point out, however, that no criminal charges have ever been filed against Deputy DeLouche with regard to the domestic matters in which Oubre represented him, but the fact remains that the instant record is deficient as to the particulars of Oubre's representation of DeLouche and his wife. For example, it is not known whether Deputy DeLouche was ever the subject of a criminal investigation by either the Sheriff's Office or some other law enforcement agency at the same time Oubre may have examined him on the defendant's behalf. If Oubre and DeLouche possessed such information, neither the defendant nor the trial court were similarly informed.
[7] For the sake of not overburdening the reader with protracted discussions of the substance of the defendant's numerous and lengthy interviews and statements, including the many contradictions, inconsistencies, and errors therein, the facts related below focus on DeLouche's involvement in obtaining many of the statements and the defendant's purported waivers of his right to conflict-free counsel.
[8] Shortly after the crime, Violent Crime Task Force investigators learned that Virginia Johnson had purchased gas just before midnight on the night of the killings. Investigators interviewed her and determined that two men she had seen entering KK's Corner were most likely involved in the killings. Johnson helped police produce a composite sketch of the first man she saw walk into KK's Corner, but she could not give much of a description of the second man, remembering only that he had had a Marlboro key chain hanging from a front pocket. Johnson was later placed under hypnosis, and also recalled a rabbit's head key chain in the second man's front pocket, but she still gave only a superficial description of the second man, insufficient for a composite sketch. A week or so after this session, she helped produce a second composite drawing of the first man.

On January 24, 1998, the television show America's Most Wanted aired a segment about the "killings at KK's Corner," depicting the events of the crime, including the detail that one of the perpetrators wore a rabbit's foot key chain in a front pocket. That evening, Lake Charles resident Lonnie Kemp contacted VCTF investigators and told them that she knew of a white male from Lake Charles who had known Stacie Reeves and wore a rabbit's foot in his front pocket. Kemp told police that she thought the man lived in New Orleans. Acting on the tip from Kemp, FBI agents eventually tracked down the defendant in Metairie, and interviewed him on May 12 and 13, 1998.
[9] During the first interview on May 12th, the defendant mentioned that he was a friend of Reeves, and claimed that he had not heard from her since he moved from Lake Charles in 1989. He also admitted that around the time that the killings took place, he had been a heavy drug user, and that while he was on drugs he had violent tendencies. He stated that it was possible that he had participated in the killings, but had no memory of it because of drug use. On the second day of interviews, the defendant claimed that he was in Metairie for the entire 4th of July weekend in 1997, and denied any participation in the killings.
[10] A neighbor in the defendant's former apartment complex testified at trial that she told the defendant he could not accompany her and some friends when they left a barbecue at the complex around 7:00 p.m. on July 4, 1997, a Friday. The neighbor said she next saw the defendant on the following Monday or Tuesday.
[11] The interview began shortly after 12:00 noon, and the written statement commenced around 5:30 p.m., concluding around 8:30 p.m.
[12] At trial, Robert Thigpen's sister, Sheila, testified that she was friends with Stacie Reeves and that she had seen the defendant with Reeves on two occasions inside KK's Corner during September of 1996.
[13] The defendant was kept in isolation for much of 1998 and 1999. At some point in the Spring of 1999, the defendant while in the general population accessed a telephone and called a local television station to make claims about the case and the involvement in the crime of the son of the then Calcasieu Parish Sheriff.
[14] That letter provided as follows:

As you are aware, I have been appointed as lead counsel in your criminal matter. Before we discuss any facts concerning your case, I want you to be aware that I am the attorney for the lead investigator for the Violent Crimes Task Force, Mr. Lucky DeLouche. I represent Mr. DeLouche in a family law matter. I also represent Mr. DeLouche's wife in a separate family law matter. If you believe that there is a conflict in interest [sic] in my representing you in your proceedings, and representing Mr. DeLouche and his wife in their separate family law matters, then I will have you brought into court so that you can explain your concerns to the judge, before we proceed. I do not believe my representation is a conflict of interest according to the Code of Ethics, and if I continue to represent you, I will do my very best to protect your rights and all matters concerning your case will remain confidential, but the decision is yours.
Please circle and sign the below [sic] appropriate paragraph that better expresses your wishes:
I, Thomas Cisco, Jr., understand that I have a right to request that Evelyn M. Oubre, be removed as my lawyer. I further understand, that if I choose to request her removal, I must do so immediately. I can not allow Evelyn M. Oubre to represent me for awhile and then decide that I no longer want her to represent me. Knowing that Evelyn M. Oubre represents Donald ["Lucky"] DeLouche and his wife in separate family law matters, and knowing that Evelyn M. Oubre will have contact with Lucky DeLouche and his wife concerning their matters, I WISH THAT EVELYN M. OUBRE REMAIN AS MY ATTORNEY.
I, Thomas Cisco, Jr., wish to ask the court to remove Evelyn M. Oubre as my attorney.
[15] Also at the September 24, 1998 hearing, originally convened to address a discovery issue, DeLouche testified that he was the director of the VCTF, the agency in charge of investigating the killings at KK's Corner. As such, he reported to the scene of the killings on the day that they happened, oversaw collection of all of the physical evidence at the scene, and supervised the extensive investigation of the crimes. He also secured either personally or at his direction a number of inculpatory statements from the defendant. Furthermore, DeLouche made the decision when to arrest the defendant formally, and oversaw the investigation of people the defendant mentioned as co-perpetrators. DeLouche testified at the hearing on the defendant's motion to suppress the statements, and extensively at trial. With the possible exception of Virginia Johnson, DeLouche represented the most important witness in the State's case.
[16] Judge Minaldi noted that Judge Quienalty had appointed LaVern as second chair on account of his perceived conflict of interest. The only information in the record as to LaVern's conflict is his motion to withdraw, in which LaVern stated that there was a conflict between the defendant" and another person represented by the [Public Defender's Office]." Notably, the defendant was apparently not appointed a replacement for LaVern until a year and a half later on July 25, 1999, when Robert J. Pastor was also appointed to the case. The record shows that Pastor handled the penalty phase of trial, while Oubre was responsible for the guilt/innocence phase.
[17] The subject of the November 8, 1999 hearing was the defendant's motion to suppress the numerous inculpatory statements made to or under the direction of Deputy DeLouche.
[18] On the other hand, if the objection is made to the claimed conflict after trial, the defendant must show he was actually prejudiced. Tart, 94-0025 at 19-20, 672 So.2d at 125 (relying on Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).
[19] Although the State insists that the district court must have held such a hearing at which she engaged in a more thorough discourse with the defendant, there exists no evidence in the record of such a hearing. The defendant further points out that counsel Oubre's time sheets do not reflect such a hearing. Since the record contains no indication that a hearing was ever conducted, this court can only assume that no such hearing transpired.
[20] In Wheat, much like in the instant case, the defendant sought representation by an attorney already representing potential prosecution witnesses. Id., 486 U.S. at 155-56, 108 S.Ct. at 1695. Unlike in the instant case, however, the district court in Wheat refused to allow potentially conflicted counsel to enroll. Id., 486 U.S. at 157, 108 S.Ct. at 1696. The Wheat court affirmed, rejecting arguments by the defendant that he should be permitted to waive any conflict. Id., 486 U.S. at 164, 108 S.Ct. at 1700.
[21] Other jurisdictions employ similar tests or court rules. See, e.g., United States v. Levy, 25 F.3d 146, 153 n. 4 (2d cir.1994) (trial court should: 1) advise defendant of dangers arising from conflict; 2) determine through questions calling for narrative answers whether defendant understands risks and freely chooses to run them; 3) give defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel); see also Michigan Court Rule 6.005 (requiring before joint representation:

1) on the record reasons why conflict does not exist; 2) defendants' on the record waiver after inquiry; 3) finding that joint representation in all probability will not cause a conflict of interest and states its reasons for the finding).
[22] As the United States Supreme Court noted in Wheat "the willingness of an attorney to obtain [conflict] waivers from [her] clients may bear an inverse relation to the care with which [s]he conveys all the necessary information to them." Id., 486 U.S. at 163, 108 S.Ct. at 1699.
[23] In fact, the first time the issue arose was only two days after counsel Oubre first met the defendant. At that point, the defendant could not yet have had any reasonable basis, either emotional, psychological, or tactical, in specifically continuing with conflicted counsel Oubre. The second time the issue arose occurred at arraignment just three weeks later, when the defendant's contact with his counsel remained similarly minimal.