STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

04-631

STATE OF LOUISIANA

VERSUS

JASON M. REEVES

**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7873-03
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Glenn B. Gremillion and Elizabeth A. Pickett, Judges.

REVERSED, SENTENCE VACATED,
AND REMANDED.

Robert Richard Bryant, Jr.
District Attorney
Carla S. Sigler
Asst. District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for Plaintiff/Appellee
        State of Louisiana

**G. Paul Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant**
        **Jason M. Reeves**

**Jason M. Reeves**
**Calcacieu Parish Correctional Center**
**5400 E. Broad St.**
**Lake Charles, LA 70615**
**In Proper Person:**
        **Jason M. Reeves**

Gremillion, Judge.

In this case, the defendant, Jason M. Reeves, was convicted of attempted simple escape in violation of La.R.S. 14:110 and 14:27 and sentenced to two and a half years at hard labor. He now appeals and, for the following reasons, we reverse Defendant's conviction, vacate his sentence, and remand for further proceedings.

**SUFFICIENCY OF EVIDENCE**

In his second assignment of error, Defendant contends the evidence was insufficient to convict him of attempted simple escape. We are required to review sufficiency of the evidence arguments first, as such a finding would result in an outright acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992).

> In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50.

*State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686.

Simple escape is defined in La.R.S. 14:110, in pertinent part, as "[t]he intentional departure, under circumstances wherein human life is not endangered, of a person imprisoned, committed, or detained from a place where such person is legally confined, from a designated area of a place where such person is legally confined." An attempt is defined in La.R.S. 14:27(A) as:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense

1

intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Thus, the State had to prove beyond a reasonable doubt that Defendant had the specific intent to escape when he committed an act in furtherance of an intentional departure from the jail. At trial, both Defendant and the State stipulated that Defendant had been in the lawful custody of the Calcasieu Correctional Center since his arrest on November 12, 2001.

Former Calcasieu Parish Deputy Jeremy LeRoy testified that he was the sergeant supervising the intake area's night shift on January 10, 2003. He explained that he was in charge of booking prisoners into the jail. Deputy LeRoy stated that high profile prisoners were segregated from the general population and housed individually in the intake cells in Pod "B." He stated that Defendant was one of the inmates housed in those cells, the other prisoners being Eric Crawford, Ricky Langley, Matthew Curtis, Kenneth Hawkins, and Ben Tonguis. All except Curtis and Hawkins were charged with capital offenses. Deputy LeRoy stated that Hawkins was a known escape risk, having escaped and attempted another escape previously.

These men, as well as one other prisoner, Kevin Courville, were allowed into the hallway that night to watch movies and pop popcorn. Deputy LeRoy explained that the prisoners were allowed to exit their cells and bring chairs from their cells into the hallway where a television was set up for them. Often the prisoners brought blankets from their cells to sit on. Deputy LeRoy testified that the prisoners were allowed to go back and forth from their cells at their leisure. He stated that the men were not handcuffed or shackled. Deputy LeRoy said the practice of movie watching was not an approved procedure at the jail, however, he explained that

2

it was a common practice for inmates to be allowed out of their cells on weekends to watch movies.

Deputy LeRoy testified that only he and former Deputy Taryn Frye were working in the intake area of the jail and were unarmed. He stated that he and Deputy Frye decided to let the prisoners out into the hall that night at 9:00 p.m., because they were not busy in intake. At the time of the incident, around 2:40 a.m., Deputy LeRoy was booking a prisoner in at the podium in the nearby control area. He was facing away from the recreation yard when Deputy Frye stepped outside into the yard to smoke a cigarette. Deputy LeRoy testified he heard a loud bang, turned around, and saw the door flying open. Deputy Frye yelled "Reeves and Hawkins" and he immediately radioed for backup. Deputy LeRoy testified that Deputy Frye then told him that the two prisoners were climbing the fence. Deputy LeRoy jumped over the intake counter and ran out the recreational yard door. He testified he saw Defendant and Hawkins at the top of the sixteen-and-a-half foot fence and twice ordered them to get down. Deputy LeRoy climbed the fence and Defendant crawled away from him and appeared to kick at him. Deputy LeRoy grabbed Defendant's foot and pulled him off of the top of the fence. Defendant suffered cuts to his arms from the razor wire and a broken toe from the fall. Deputy LeRoy then ordered Hawkins to get down and he complied. Deputy LeRoy testified that he noticed there was a blanket folded over the razor wire at the top of the fence. Both Deputies LeRoy and Frye testified that the blanket was not on the fence top prior to the escape attempt.

Timothy Vezinat testified that he works for the sheriff's department in building maintenance. He stated that he removed a blanket from the razor wire at the

3

top of the fence at about 10:00 a.m. on January 11th, and identified that blanket as it was introduced into evidence during the trial.

Deputy Frye testified that she had taken her key and unlocked the recreational yard door to step outside and smoke a cigarette. She explained that the door was just resting against the frame, but was not securely shut and locked. Deputy Frye testified that having the door unsecured was in violation of jail policies, but that it was common practice to leave it unlocked. She stated she was standing just outside the door, leaning against a nearby brick wall when Hawkins and Defendant came through the recreational yard door and took off. She stated: "Kenneth Hawkins was first, and Jason Reeves was pretty much heel-to-toe with him in his back." Deputy Frye testified that the two hit the door pretty hard and Defendant attempted to slam it shut behind him, but it popped back open. Deputy Frye immediately stepped inside and told Deputy LeRoy that the two men were outside. She corroborated that Deputy LeRoy climbed the fence and pulled the Defendant down, and Hawkins came down on his own.

Deputy Micheal Bourgeois testified that he ran to the intake area when the backup call came over the radio. Once he arrived, Defendant was already handcuffed. Deputy Bourgeois stated that he ordered Hawkins off of the fence and he climbed down. Lieutenant Mike Williams corroborated Deputy Bourgeois' testimony.

Calcasieu Parish Sheriff's Detective Randy Benevage stated that although he was not present during the incident in question, he investigated the attempted escape of Defendant and Hawkins. Detective Benevage referred to a

4

diagram of the jail's intake area while testifying. He explained that the two men went through one door, ran fourteen feet to another door, and ran about one hundred feet through the yard where they jumped on the fence in one of the corners.

Inmate Kevin Courville testified that he was incarcerated at the Calcasieu Correctional Center at the time of the incident. He stated that he had been at CCC for two weeks, and was transferred the day after the escape attempt occurred. Courville testified regarding the incident by referencing a drawing of the intake area. He stated that he drew the diagram of the cell areas about two weeks before trial when he decided to come forward with what he knew. The drawing depicts the locations of Defendant's cell and the movie viewing area in the hallway. Courville testified that he was allowed to leave his cell with the others to watch movies at about 9:00 p.m. He said that he was the top trustee at the CCC. He stated that Defendant, Hawkins, Tonguis, and two black males had been watching the movies for about five hours.

According to Courville, at one point Defendant and Hawkins went into Hawkins' cell and brought a chair from the hallway with them. The cell door was open and Courville could see the two men talking and Defendant appearing to trim Hawkins' hair with a razor. Courville testified that one time both men got up and went to the window of the cell and looked outside. He explained that the window of the cell looked out onto the outside recreation yard for the intake area. When the men left the cell, Hawkins had a folded blanket that he took into the hallway. The men then faced their chairs toward each other and Hawkins put the blanket on his lap and began playing cards together and talking. Courville testified that he heard Defendant

5

say that he knew how to handle razor wire because he had worked for a company that installed razor wire. Courville stated that the comment got his attention because of the previous actions of the two men and because Defendant continued to look over his shoulder into the intake area. He said there was only one female guard and one male guard working in the area.

Courville testified that when he got up to get a drink from the water fountain, he saw the male guard was in the "tower" at a desk. He stated the female guard was standing in the recreational door smoking a cigarette and talking to the male guard. He testified that the female guard was holding the door cracked open, with her leg between the door and the door frame. When Courville was walking back to his cell, he heard a loud slam. He testified that he looked back and saw Defendant and Hawkins running out of the glass door in the hall and into the intake area. He explained that, although the two men were running almost side by side, Hawkins left the building first. Courville said Hawkins was carrying a blanket. Courville stated that the two men headed straight to the recreational area door and knocked the female guard aside. However, Deputy Frye testified she was standing near the door, and did not state either man made contact with her. At that point, the male guard told Courville to lock himself into his cell and he complied. Courville watched from his cell door as more guards ran into the area, and later saw the guards escorting Hawkins and the injured Defendant back into the facility.

Defendant claims that the State failed to meet its burden of proof as there were other plausible explanations for his actions. However, the jury is free to believe some witnesses and not believe others. Apparently, the jury believed the State's

6

witnesses even though Courville may have been discredited because of his prior criminal record. In fact, the record reflects that each witness' version of the events surrounding the attempted escape matches up quite well. When reviewing this case in the light most favorable to the prosecution, we find that the jury could have reasonably concluded that the essential elements of the crime of attempted escape were proven beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

## CONFLICT-FREE COUNSEL

In this assignment of error, Defendant contends the trial court erred in denying his request for conflict-free counsel. He asserts that the trial court committed error when it found that an actual conflict existed, but that the conflict was cured by a waiver of the witness.

At a pretrial hearing, Defendant moved for the appointment of conflict-free counsel. After hearing arguments, the trial court denied the motion stating any potential conflicts with specific witnesses could be dealt with at trial. During the trial, the State indicated it would call inmate Courville. The attorney representing Defendant was Ron Ware, the director of the Public Defender's Office. Ware told the trial court that Courville was a former client of the Public Defender's Office, having been represented by several attorneys in that office on several different charges. Ware told the trial court he reviewed Courville's Public Defenders's Office file and recognized his own handwriting, indicating that he had acted as Courville's attorney at some point. Ware argued that the conflict was in having to cross-examine

7

his former client, especially since he had confidential information gained from his representation of Courville.

The trial court stated that it found an actual conflict existed and asked the State to respond. The State put Courville on the stand and he stated that he understood the attorney-client privilege. Courville waived the privilege and stated that he had no problem with any confidential information being revealed by the Public Defender's Office. Defendant argued that the conflict was not the witness's to waive, but his instead.

The trial court stated its reasons for ruling, referring to *State v. Cisco*, 01-2732 (La. 12/3/03), 861 So.2d 118, *cert. denied*, ___ U.S. ___, 124 S.Ct. 2023 (2004), as follows:

> Referring back again to the case law that I have reviewed. On its surface because of the definition of actual conflict being a former client, the Court found that an actual conflict exists.
>
> However, in defining the actual conflict the Court referred back to The State v. Kahey, K-a-h-e-y, 476 So.2d 475, as well as the language in Zuck versus Alabama U.S. Supreme Court case, 100 Supreme Court 63. The standard is when a Defense attorney owes a duty to a party whose interests are adverse to those of the defendant then an actual conflict exists.
>
> The interest of the other client and the defendant are sufficiently adverse to determine if the attorney in speaking to the defendant takes some action that could be detrimental to the client.
>
> It is the Court's opinion that based on the recitation and the information obtained, that Mr. Courville has knowingly and intelligently waived any rights or attorney/client privileges that he may in fact have.
>
> By waiving these rights he's also waived the duty that would be owed to him by his prior Defense counsel. And thus in removing the duty would also remove the actual conflict that would exist. The conflict is a result of hamstringing the defense attorney from being able to zealously and adversely cross examining a previous client.

8

But with the removal of any attorney/client privileges as done here in open court, that hamstringing will not occur.

Therefore, the Court finds that after further information elicited, which the record will speak for itself, that there is no actual conflict between Defense counsel and Mr. Courville.

And the Court will allow the State to call Mr. Courville, noting that he will be open to full and open cross examination without restrictions.

Defendant argues that because the trial court found that an actual conflict existed, the law presumes that his representation would be adversely affected. He maintains that the conflict may be waived by a defendant, but not a witness, because the issue involves the accused's sixth amendment right to effective counsel. Because there was an actual conflict that the trial court did not cure, he asserts that he was denied effective assistance of counsel and his conviction must be reversed.

In *Cisco*, 861 So.2d 118, the Louisiana Supreme Court reversed the defendant's conviction based on his attorney's conflict of interest. The defendant's attorney appeared to have simultaneously represented the state's main prosecution witness and his wife, and the defendant who was on trial for his life. Once appointed to represent the defendant, the attorney notified him about her potential conflict of interest. She assured him that she did not have a conflict and left it up to the defendant to decide if he wanted another attorney. At a pretrial hearing, defense counsel stated that the defendant waived any conflict of interest.

The supreme court found that the defendant's attorney had an actual conflict when called upon to cross examine her client, who was also the state's main prosecution witness against the defendant. The supreme court found that the defendant's waiver of conflict was not knowingly and intelligently made.

9

The supreme court outlined the procedure to be followed when a conflict exists. It stated:

> After the court has been alerted that an actual conflict of interest exists, the judge must take the proper steps to assure that the defendant's Sixth Amendment right to effective assistance of counsel is not violated. [*State v.*] *Carmouche*, 508 So.2d [793,] 804 [(La.1987)]. As noted above, when a defendant raises the issue of a conflict of interest prior to trial, the judge is required either to appoint other counsel or to take adequate steps to determine whether the risk of a conflict of interest is too remote to warrant other counsel. *State v. Edwards*, 430 So.2d 60, 62 (La.1983) (*quoting Holloway v. Arkansas* [, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed. 2d 426 (1978)]). Those steps were set forth in *Carmouche*, wherein we determined that the judge, while being mindful of the restrictions inherent in the attorney/client privilege, should first require the attorney to disclose the basis of the conflict. 508 So.2d at 805. Then, "[i]f the judge determines that the conflict is not too remote, he should explain the conflict to the defendant . . . and inform the defendant of his right to representation that is free of conflict." *Id.* Thereafter, if the defendant chooses to proceed with conflicted counsel, "a statement should be prepared in narrative form, which indicates that the defendant is fully aware of his right [to conflict free counsel] but has chosen to make a knowing and intelligent waiver thereof.["] *Id.* (*citing United States v. Winkle*, 722 F.2d 605 (10th Cir.1983), and *United States v. Martinez*, 630 F.2d 361 (5th Cir.1980)); *see State v. Odle*, 02-0226, pp. 19-20 (La.App. 3d Cir.11/13/02), 834 So.2d 483, 497; *State v. Sartain*, 98-0378, pp. 11-12 (La.App. 4th Cir.12/1/99), 746 So.2d 837, 846; *see also United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir.2002); *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir.1998).

*Id.* at 132.

In *State v. Carmouche*, 508 So.2d 792, 805 (La.1987), the supreme court wrote:

> Once the judge determines that a conflict of interest in fact exists, it is presumed that the conflict will affect the defense counsel's representation of his client. If the trial court fails to take the proper steps to protect defendant's rights to effective counsel, a reversal of the conviction is required.

In the instant case, Defendant moved for conflict-free counsel, but the trial court found that his attorney did have an actual conflict of interest. Therefore, as stated in *Cisco,* the trial court was required to take the proper steps to protect

10

Defendant's right to effective assistance of counsel. However, the trial court merely obtained a conflict waiver from the witness who was the defense attorney's former client. The conflict was not the witness' to waive. In this instance, the only proper recourse to protect Defendant's right to effective counsel was to appoint conflict-free counsel. Accordingly, the trial court did not take adequate steps to ensure that Defendant's right was protected. Consequently, the trial court erred in denying Defendant's motion for conflict-free counsel and, according to *Carmouche*, a reversal of the conviction is required. Therefore, Defendant's conviction is reversed, the sentence vacated and set aside, and the matter is remanded to the trial court for further appropriate proceedings.

## OTHER ASSIGNMENT OF ERROR

In his other assignment of error, Defendant contends the trial court erred in sustaining the State's objection to his questions regarding a possible defense of entrapment. Defendant attempted to elicit information from State witnesses regarding whether they knew that an attempted escape conviction would help the State's efforts to have Defendant receive the death penalty in another case. Because we have reversed Defendant's conviction, this assignment of error is rendered moot.

## CONCLUSION

Defendant's conviction is reversed, his sentence vacated and set aside, and the case is remanded for further proceedings such as a new trial and the appointment of unconflicted defense counsel.

## REVERSED, SENTENCE VACATED, AND REMANDED.

11