WEIMER, J.,
dissenting.
|,In our adversarial system of justice, each side is represented by opposing counsel. No matter how abhorrent the crime, for that system of justice to function properly, conflict free counsel is essential.
To that end, this court and the United States Supreme Court have set forth certain standards for counsel with which our trial courts must comply. Here, the majority of this court has selected the wrong standards, in no small measure due to the fact that the majority’s analysis begins with a false premise: “at no point before trial did the issue of conflict of interest arise.” Op’n, p. 28. The record shows otherwise. It was in the pretrial phase that conflicting interests arose and were identified by the district court, but a trajectory was set for reversible error at trial, as follows.
I. Pretrial: Conflicting Defenses
Initially, all three men arrested in connection with Matthew Millican’s murder— Michael Garcia, his brother, Danil Garcia, and their friend, James Nelson, II — were charged with murder in the first degree. Each, therefore, faced a possible death penalty. On February 17, 2006, the district court appointed counsel from the ^Eighteenth Judicial District’s Indigent Defender Board[1] to represent all three men. When appointing counsel from the Indigent Defender Board, the district court observed a problem of having the same office represent three capital defendants:
THE COURT: .... We set this matter for preliminary examination this morning. Of course, all three of them are charged with first degree murder and other charges. As everyone knows, first degree murder does carry possible death penalty, depending on what the jury decides.
I appointed the Indigent Defender’s office to represent these three individuals. But we have to have two Indigent Defender Board certified public defenders to represent each one of them, which means we need six. We *48 have eight in the district. All eight are not certified by the Indigent Defender Board. So that being the case, we have to continue this matter until Tuesday to give some opportunity to look into this matter and see who can represent who and try to get the logistics of that worked out.
Although the district court observed that there was a problem with appointing attorneys from the same Indigent Defender Board because there were not enough attorneys certified as capital defenders, the district court tasked Mr. Jerome “Jerry” D’Aquila, chief[2] of the Indigent Defender Board, with the responsibility of solving that problem:
| ¡¡THE COURT: _What I’m going to do today, though, to make sure that we’ve got at least this much covered: I’m going to appoint Jerry D’Aquila as an Indigent Defender to represent Michael Garcia. He will be the lead counsel in that case, State versus Michael Garcia. I’m going to appoint Tommy Thompson as second chair to represent Mr. Garcia, because he has been certified as second chair on first degree murder cases, so he will be second chair on Michael Garcia.
I will appoint, again, the Indigent Defender’s office for the other two individuals and, Jerry, y’all are going to figure out who is going to represent who, y’all are going to get this worked out for Tuesday?
MR. D’AQUILA: We’ll take care of that internally in the office, Judge.
Defendant’s jury trial commenced on June 4, 2008. The state’s case-in-chief included testimony from Nelson, who stated that Matthew was stabbed by the Defendant. To show that Matthew was instead stabbed by Nelson, the Defendant offered the testimony of a forensic pathologist, Dr. Emile Laga.
This court’s majority, however, downplays the conflicting interests inherent in this situation, where lawyers from the same IDB represented the only two people who actually knew whose hand drove the knife into the victim and who each blamed the other. The majority describes the conflict as a matter of a simple detail: “The only detail in dispute was whether defendant or Nelson wielded the knife that killed Matt. There is no doubt both were principals to the murder. Therefore, the ‘issue of conflicting loyalties’ did not actually arise.” (Op’n, p. 33-34).
The majority’s description misses the mark. As noted in the factual summary above, because Matthew was led further into the woods by Nelson and Defendant, the only other witness, M.T., did not herself see the final circumstances surrounding Matthew’s death. Given this situation, where only two principals (Nelson and Defendant) out of the three apparent principals to the murder knew who had inflicted |4the single, fatal stab wound, the conflict between Nelson and Defendant was not the matter of a simple factual “detail” as the majority suggests. From the district court’s charges to the jury, what the majority here now calls a question of “detail,” in the minds of jury members, could reasonably and lawfully phrase as: “who committed an act possibly meriting the penalty of death?” It is well settled that the ques *49 tion of which co-participant actually inflicted the fatal blow in a homicide which occurs as the result of concerted action by two or more co-participants is relevant to the jury’s assessment of moral culpability when a defendant may be sentenced to death. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
Therefore, depending on whether the jury ascribed the “detail” of stabbing Matthew to the Defendant or to Nelson, that “detail” could greatly change the jury’s view of whether the Defendant deserved the death penalty. If the jury believed that Nelson stabbed Matthew, the jury could determine that the Defendant had lesser moral culpability and could have decided the Defendant should be imprisoned for life. Certainly, the jury could still determine that the Defendant’s moral culpability sufficiently merited the death penalty, even if the jury members believed Nelson stabbed Matthew, because the Defendant would be a principal to the murder in that scenario. By contrast, even if the jury believed the Defendant stabbed Matthew, the death penalty is not automatic; the jury might have determined that life imprisonment was the appropriate penalty. The greatest moral culpability, however, and the greatest likelihood Defendant could be sentenced to death arises if the jury believed the Defendant stabbed Matthew. See Id. Thus, nothing less than Defendant’s life potentially hung in the balance of how the jury viewed Nelson’s testimony against the Defendant. Yet lawyers from the Eighteenth Judicial District IDB represented them both.
| .41. The Two General Standards of Review
The jurisprudence on conflicts of interest has developed two distinct standards for reviewing claims on appeal that a conflict of interest unconstitutionally impairs a defendant’s rights. For decades, the choice for appellate courts between the two standards has been largely dictated by whether a defendant had objected at trial or instead first raised the issue of a conflict of interest on appeal. See State v. Edwards, 430 So.2d 60, 62 (La.1983). In Edwards, this court observed that objections to conflicted representation made in the trial court are reviewed under the mandate of Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). “In this situation, the Court held that the trial judge is required ‘either to appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel.’ ” Edwards, 430 So.2d at 62, quoting Holloway, 435 U.S. at 484, 98 S.Ct. 1173. In contrast, as noted in Edwards, claims that counsel labor under a conflict of interest raised for the first time on appeal are reviewed under Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), where “the Court held that a defendant ‘in order to establish a violation of the Sixth Amendment ... must demonstrate that an actual conflict of interest adversely affected his lawyer’s performance.’ ” Edwards, 430 So.2d at 62, quoting Sullivan, 446 U.S. at 348, 100 S.Ct. 1708.
More recently, in Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the Supreme Court explained the consequences of these two prevailing standards. “Holloway ... creates an automatic reversal ... where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict.” Mickens, 535 U.S. at 168, 122 S.Ct. 1237, citing Holloway, 435 U.S. at 488, 98 S.Ct. 1173. Under the Sullivan standard, reversal is not automatic; instead, when there has been no objection in the trial court, “a defendant must demonstrate that *50 ‘a conflict of interest factually affected the adequacy of his representation.’ ” Mickens, 535 U.S. at 168, 122 S.Ct. 1237, quoting Sullivan, 446 U.S. at 348-49, 100 S.Ct. 1708.
Although there is no automatic reversal under the Sullivan standard, the trial court has “a duty to inquire into the propriety of a multiple representation ... when ‘the trial court knows or reasonably should know that a particular conflict exists.’ ” Mickens, 535 U.S. at 168, 122 S.Ct. 1237, quoting Sullivan, 446 U.S. at 347, 100 S.Ct. 1708. If the trial court neglects the duty to inquire into the propriety of counsel representing more than one defendant, when the Sullivan standard is applied, a defendant must show that a conflict of interest affected counsel’s performance in order to justify reversal. See Mickens, 535 U.S. at 171-72 and 172 n. 5, 122 S.Ct. 1237.[3]
III. If Neither the Holloway Nor Sullivan Pattern Precisely Applies, a Reviewing Court in a Capital Case Must Apply the Standard Most Protective Against Conflicts of Interest. Moreover, a Fundamental Right Besides the Right to Counsel was Denied.
Keeping in mind the above general framework of the two standards for reviewing claims of counsel with conflicts of interest, it is appropriate to turn to how the issue of a conflict of interest arose in the present case to determine which standard to apply. The majority fails to recognize what the record shows-that what transpired in the district court precisely fits the pattern of neither the Holloway standard nor the Sullivan standard.
Indeed, in the district court the issue of conflicted counsel was raised by the court itself, but was neither resolved nor pursued further. As the district court stated: “I just want to throw that out to /all. I don’t know what the logistics are behind 17getting that together, as far as whether you need [a certified capital defense attorney from outside your office] or not.” This situation is unlike Holloway because it cannot be said from the excerpt just quoted that the district court forced counsel to continue to labor over counsel’s clear protests. This situation is also unlike Sullivan because it cannot be said that the district court wholly failed to raise the issue of conflicted representation.
Importantly, although the Holloway standard is often thought of as being triggered by a formal objection during trial, “a formal incantation is not required to make an objection in the trial court.” State v. Carmouche, 508 So.2d 792, on reh’g, 508 So.2d 803, 804 (La.1987). Instead of a formal objection or some other talismanic words, what is primarily important is that “a conflict has been explicitly raised before the court” and, when that conflict has come to the court’s attention, “the trial judge must assume some responsibility to examine the nature of the conflict and its possible ramifications.” Id., on reh’g, 508 So.2d at 804.
In Carmouche, counsel concurrently represented both the defendant and the defendant’s cellmate and, on the last day of trial, the state served notice that it *51 intended to call the cellmate to testify to inculpatory statements made in jail by the defendant. Carmouche, 508 So.2d at 794-95. Counsel did not formally object, did not ask to be relieved of representing the defendant, did not request a recess to develop impeachment evidence, and did not move for a mistrial. Id., 508 So.2d at 795. Instead, counsel notified the court that concurrent representation “may be a distinct disadvantage to me because I may not be able to cross-examine [the cellmate] on certain things because there may be a conflict of interest in what he told me.” Id. Notwithstanding the concern the trial court had learned, the trial court directed that the trial continue without addressing the concern further. Id. Defendant was | ¡^ultimately convicted of first degree murder and sentenced to death. Carmouche, 508 So.2d at 793.
On appeal, this court, in Carmouche, initially ruled that because there was no formal objection and that counsel’s “fleeting reference” at trial to his representation of the cellmate suggested there was only a potential conflict of interest, that the Sullivan standard applied. Carmouche, 508 So.2d at 797. Noting that counsel never cross-examined the cellmate, this court initially found that “the potential conflict never ripened into an actual conflict.” Id. Thus, this court ruled that there was no reversible error. Id.
On rehearing in Carmouche, however, this court found that the lack of a formal objection “presents] facts fallfing] directly between Cuyler v. Sullivan ... and Holloway v. Arkansas.” Carmouche, on reh’g, 508 So.2d at 805. Faced with facts squarely invoking neither the Sullivan nor the Holloway standard, but requiring this court to choose one standard to apply-the same choice presently confronting this court-this court in Carmouche found that reversal under the Holloway standard was required. See Id. “If the trial court fails to take the proper steps to protect defendant’s right to effective counsel, a reversal of the conviction is required.” Id. We explained that the trial court was, in fact, aware of the problem of joint representation during trial and we emphasized that “[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.” Carmouche, on reh’g, 508 So.2d at 805, quoting Glasser v. United States, 315 U.S. 60, 75-76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).
Representation by counsel in a criminal trial is no less important today than when the Supreme Court made its pronouncement in Glasser or when this court cited | ¡¡this pronouncement to guide our choice of the appropriate standard of review for the conflict of interest issue raised in Carmouche. Notably, the Defendant here-like the defendant in Carmouche-faced at trial and was actually sentenced to the ultimate penalty of death. Therefore, because a death penalty (once carried out) is irrevocable and, given a record that precisely fits neither the standard of review of Holloway (because there was no formal objection) nor the standard of review of Sullivan (because the district court raised the issue of conflicted representation but did not inquire or act further on the issue), the law again dictates following the standard of review prescribed by Holloway.
Under Holloway, the district court must respond in some manner to the possibility that counsel labors under a conflict of interest. Specifically, the court must either “appoint separate counsel or to take adequate steps to ascertain whether the risk [i]s too remote to warrant separate counsel.” Holloway, 435 U.S. at 484, 98 S.Ct. 1173. A consequence of the Holloway standard is that it relieves,a defendant from having to connect a conflict of inter *52 est with “proof of effect upon representation.” Mickens, 535 U.S. at 173, 122 S.Ct. 1237.[4] The reason reversal was automatic under Holloway, explained the Mickens Court, is a presumption “that the conflict, ‘which [the defendant] and his counsel tried to avoid by timely objections ... ’ undermined the adversarial process.” Mickens, 535 U.S. at 168, 122 S.Ct. 1237, quoting Holloway, 435 U.S. at 490, 98 S.Ct. 1173.
Even if this court had not already addressed in Carmouche the question of which standard to apply when the facts neatly fit neither the pattern of Holloway nor of Sullivan, in this capital case, I find there is a presumption here that the adversarial linprocess has been undermined by the joint representation of defendants with antagonistic defenses. Indeed, it appears the “adversarial process” has not only been “undermined,” (Mickens, 535 U.S. at 168, 122 S.Ct. 1237) but has fully collapsed when one group of counsel attempted to prevent a death sentence for the Defendant and another group from the same IDB brokered a deal for Nelson to testify against the Defendant as a key witness in the state’s effort in obtaining Defendant’s death sentence.
With a possible death sentence hanging in the balance, this is not merely a situation where divergent allegiances of counsel “make it difficult to measure the precise harm” (Id.) taking place behind the scenes. Therefore, it must be remembered that Holloway and its progeny do not simply establish a standard of appellate court review, those eases establish a standard of trial court protection. So important is this protection that this court’s earlier statement of it bears repeating: “[W]hen a conflict has been explicitly raised before the court, the trial judge must assume some responsibility to examine the nature of the conflict and its possible ramifications.” Carmouche, 508 So.2d at 803.[5] When the district court here explicitly raised the issue of a conflict, the court failed to further pursue the issue and appropriately |n resolve it. Instead, the district court tasked the chief of the Eighteenth Judicial District’s IDB with allocating the office’s resources and, from all that appears, the court solely tasked defense counsel with continued vigilance against conflicts of interest. Although defense counsel have a role in informing a trial court of conflicts,[6] the district court’s *53 delegation of all responsibility deprived the Defendant of a necessary feature of the constitutional protection against conflicts: the district court’s independent judgment.
Thus, the majority’s review of this record as solely presenting a right to effective counsel issue is incomplete. By inquiring no further about the propriety of joint representation, the independent judgment of the district court was never available to the Defendant, let alone exercised. This is a matter of fundamental fairness and due process.
A post-Mickens opinion from the Supreme Court not cited by the majority holds that when the right to counsel is violated in a manner extending beyond the defendant’s right to have effective counsel, not only is the question of counsel’s effectiveness not relevant, but also prejudice need not be shown. In United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), the trial court denied defendant his choice of retained counsel for reasons that the court of appeals later found were wrong. Before the court of appeals made its determination that the defendant had wrongly been denied his choice of counsel, the case against the defendant proceeded to trial and the jury found defendant guilty. Defendant appealed his conviction and, citing the denial of his right to counsel of his choosing, the court of appeal vacated the conviction and the Supreme Court granted certiorari.
112The Court found the trial court had committed a constitutional violation that was a “structural defect” because it “af-fec[t][ed] the framework within which the trial proceeds.” Id. at 148, 126 S.Ct. 2557. The Court rejected the government’s argument that a reversal of the conviction required a showing of prejudice. The Court explained that the right at issue was separate from the right to effective counsel and the requirement to show prejudice was confined to claims of ineffective assistance of counsel where “the requirement of showing prejudice ... stems from the very definition of the right at issue.” Id. at 150, 126 S.Ct. 2557.
In the present capital case, where the issue of conflicted counsel was raised by the court itself, but was neither resolved nor pursued further, the constitutional right at issue extends beyond the right to have competent counsel. As noted above, the district court is required to ensure fundamental fairness, which in this instance required the district court to exercise its independent judgment to inquire into the propriety of joint representation. See Id. at 152, 126 S.Ct. 2557, citing Wheat v. U.S., 486 U.S. 153, 159-160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (observing that because a trial court is the arbiter of which lawyers may practice before the court, the trial court is therefore tasked with deciding, among other matters touching upon the right to counsel, whether to refuse a defendant’s “demand that a court honor his waiver of conflict-free representation.”).
In sum, the standard already recognized by this court in Carmouche requires a new trial. Similarly, under the more recent jurisprudence of the U.S. Supreme Court examining when a fundamental right beyond the minimal right to have effective counsel has been violated, a new trial is also required. Because this is capital case, these justifications for a new trial apply with the greatest force possible.
| iSIV. The Association of IDB Attorneys Renders Those Attorneys the Equivalent of a Law Firm
The majority now glosses over this court’s prior ruling in Carmouche, under which reversal is required, with only the *54 observation that in this case, unlike Car-mouche, “[n]one of defendant’s counsel was called upon to cross-examine any of his former or current clients in the State’s prosecution.” (Op’n, p. 33). As noted by the majority, this court has twice recognized indigent defender boards are the equivalent of private law firms for purposes of the Sixth Amendment’s protection against conflicted counsel and Carmouche, therefore, applies. See State v. Connolly, 06-0540, p. 6 n. 1 (La.6/2/06), 930 So.2d 951, 954 n. 1; State v. McNeal, 594 So.2d 876 (La.1992), reversing State v. McNeal, 593 So.2d 729 (La.App. 4 Cir.1992). Counsel associated in a law firm or its equivalent, such as the Eighteenth Judicial District IDB here, must avoid representing a client “when any one of them practicing alone would be prohibited from doing so.” Connolly, 06-0540 at 6 n. 1, 930 So.2d at 954 n. 1, quoting La. Rules of Professional Responsibility, Rule 1.10(a).
After engaging in a lengthy analysis of the employment status of the IDB lawyers and noting the district court “concluded the delivery of indigent defense in the Eighteenth Judicial District was through independent contractors” (Op’n, p. 29), the majority later appears to overrule the district court’s finding: “the employment status of the indigent defenders is immaterial.” (Op’n, p. 29-30). I agree with the majoritys conclusion on that latter point because the individual employment status of the lawyers is not the sole route for treating the Eighteenth Judicial District IDB lawyers collectively as being equivalent to a law firm.[7] | uTherefore, I also agree with the majority that Rule 1.10(a) is one route for treating a collective group of lawyers as the equivalent of a law firm. However, even after citing Rule 1.10(a) of the La. Rules of Professional Conduct for the proposition that Rule 1.10(a) governs when lawyers must be considered to be practicing law within the equivalent of a “law firm,” the majority fails to apply Rule 1.10(a).
The proper application of Rule 1.10(a) is straightforward. When evaluating which lawyers are generally disqualified from joint representation, Rule 1.10(a) refers to lawyers who “are associated in a firm.” The touchstone of being in a firm is “association,” not employment. Id. An association marked by an employment relationship is merely one type of an association. See Comments to ABA Model Rule 1.10 (“For purposes of the Rules of Professional Conduct, the term “firm” denotes lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization. See Rule 1.0(c).”).[8]
*55 115Importantly, under Rule 1.10, there need be no lawyer dubbed as a supervisor over the association of lawyers in order for the association to be treated as the equivalent of a law firm for purposes of prohibiting joint representation. But here, as the majority notes, there was such a supervising attorney.
The supervising attorney, the chief of the Eighteenth Judicial District IDB, actually represented the Defendant. The majority dismisses the significance of this fact by labeling the chiefs duties as “wholly administrative rather than substantive.” (Op’n, p. 84). However, in ascertaining how much the Eighteenth Judicial District IDB actually resembled a law firm, the fact of supervision under any label cannot be overlooked. As the district court found on remand, Defendant’s counsel, in his position as chief, had a right to control Nelson’s attorneys and this right included the ability to terminate Nelson’s attorneys’ association with the IDB and likewise those attorneys’ ability to represent other IDB clients. (R. Supp.1241) Moreover, the chief indigent defender had a statutory duty to “[mjanage and supervise public defender services” and to “[sjupervise the work of the district personnel.” La. R.S. 15:161(E)(1) and (6).[9]
The majority further describes the IDB attorneys as metaphorical islands of law-yering, far removed from chief D’Aquila, who cannot “interfere with the independent professional responsibilities and judgment exercised by the contract attorneys.” (Op’n, p. 34). Not only is this blithe de-seription defeated by the record evidence showing chief D’Aquila held hiring and firing authority over the IDB attorneys, but the majority’s evaluations of how the Eighteenth Judicial District IDB h ¿might differ from a law firm are contradictory. On the one hand, the majority claims that legislative amendments in the year 2007 (after counsel had already been assigned) render the IDB unlike a law firm. (Op’n, p. 28-29). On the other hand, the majority claims that because “[t]he provision of indigent services in the Eighteenth Judicial District has continued in that way [of staffing] since 1972” (Op’n, p. 34), the IDB was unlike a law firm. If the first assertion is true — that statutory restructuring in the year 2007 fundamentally changed the Eighteenth Judicial District such that it became unlike a law firm — the second assertion cannot also be true.
What the record on remand actually shows is that before the legislative amendments in the year 2007 and, therefore, when the case assignments were made and much pretrial work by the IDB lawyers was performed, the lawyers were even more tightly associated than now, after the legislative amendments. During the relevant time period, the Eighteenth Judicial District IDB compensated its attorneys as employees with all the related consequences of having employees, including the issuance of W-2 forms and the payment of taxes. The district court observed that during much of the time period at issue *56 here, the attorneys received W-2 forms, but that later, and up to the present time, the attorneys were issued 1099 forms. Of course, this change from a W-2 compensation arrangement during the relevant period to a later 1099 compensation arrangement further compels the conclusion that during the period relevant here, the attorneys were actual employees.[10]
In any event, and the majority’s blanket descriptions aside, the Eighteenth Judicial District IDB attorneys were not isolated islands of lawyering, cast adrift to |17fend for themselves and to forage for their own resources. Instead, the record on remand confirms that there was considerable sharing of resources among attorneys of the Eighteenth Judicial District IDB. Secretarial staff were shared and were not screened from files in cases of joint or multiple representation. Consequently, measures to prevent inadvertent disclosure by secretarial staff of confidential information, such as attorney notes, were incomplete at best. See Restatement (Third) of Law Governing Lawyers, § 123(3) (imputing disqualification to lawyers involved in joint or multiple representation when their employment relationship is marked by a “sharing of] office facilities without reasonably adequate measures to protect confidential client information so that it will not be available to other lawyers in the shared office.”).
While it is true that well after the Defendant was indicted, statutory reforms were geared to preventing the problems arising here by appointing “conflict panels” staffed with outside counsel[11] in order to avoid “associated” lawyers from advancing conflicting interests (see Rule 1.10(a) and 1.0(c)), the record reflects that from the very beginning, even before the legislative reforms were enacted, lawyers from the Eighteenth Judicial District had no such panels available to them. Thus, there is no factual or legal reason to depart from this court’s rulings in Connolly and McNeal; the lawyers of the Eighteenth Judicial District must be construed as the equivalent of a law firm.
V. The Conflicts Were Broad and Pervasive
This court has defined a conflict of interest as follows:
|islf a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.
State v. Cisco, 01-2732, p. 18 (La.12/3/03), 861 So.2d 118, 130, cert. denied, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004), quoting State v. Kahey, 436 So.2d 475, 484-85 (La.1983), quoting Zuck v. Alabama, 588 F.2d 436, 439 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
As noted earlier, the record on remand shows indicators of the Eighteenth Judicial District IDB lawyers being “associated” *57 together, such that their association was the equivalent of a law firm. Many of those indicators of association in the remand record were economic. Not surprisingly, in the original trial record, the first conflicting interests to arise were also economic.
At the hearing on February 21, 2006 (long before the statutory reform of IDB services relied upon by the majority), the district court was undoubtedly informed that only the chief of the Indigent Defender Board and his co-counsel were certified in that office to represent defendants in capital cases. At the time, Defendant, Danil Garcia, and James Nelson all faced the possibility of a death sentence. At least two attorneys must be appointed to represent each indigent defendant facing a capital charge and “[a]t least two of the appointed attorneys must be certified as qualified to serve in capital cases.” La. Sup.Ct. Rule XXXI(A)(l)(a). The Eighteenth Judicial District’s IDB, therefore, had a powerful economic incentive to de-capitalize the cases of Danil Garcia and James Nelson to avoid the expense of obtaining outside counsel. In fact, the chief of the Indigent Defender Board, who was assigned to represent Defendant, informed the district court early on that his office could not bear the expense of obtaining additional, outside counsel certified in capital cases.
119These conflicting economic interests were on full display, in open court, during the preliminary hearing on February 21, 2006. Already, the ease assignments to represent-by attorneys of the Eighteenth Judicial District IDB-all defendants implicated in Matthew’s murder, had been made. Two lawyers from that office were assigned to represent James Nelson. Even after the case assignments had been made at this early stage, as recounted by the majority, “the District Court indicated that there was another decision for the attorneys of the Indigent Defender Board to make.” (Op’n, p. 13). Because of its central importance, I reprint from the majority’s opinion the following colloquy:
THE COURT: .... Before we get started, let me — I need to make this statement: yesterday, I received a phone call at my house from Nelvil Hollingsworth, do you know Nel-vil—
MR. THOMPSON: I spoke with him today, Your Honor.
THE COURT: He let me know that — he said, “I have a death qualified team that is ready to defend, if 3⅛11 need us.” I just want to throw that out to y’all. I don’t know what the logistics are behind getting that together, as far as whether you need him or not ....
The topic quickly turned to the financial considerations of appointing another attorney qualified to defend a capital murder charge:
MR. THOMPSON: I can tell you what they are. If you call him right now, he will be here if you’ve got about forty grand, Judge.
[[Image here]]
MR. D’AQUILA: We don’t have those funds in our district.
The district court then commented on the issue of financial cost:
lanTHE COURT: Let me say this: of course, you know, trying a first degree murder case is ■ not cheap. Any time you talk about trying a person for their life, money cannot be the overriding factor in determining what to do.
However, after declaring that cost should not preclude independent representation, the district court did not alter its previous pronouncement that attorneys of the Indigent Defender Board *58 would have to decide whether outside counsel was needed.
(Op’n, p. 14).
After reviewing this portion of the record, the majority notes that the preliminary hearing then resumed. The majority does not recount, however, that at the hearing M.T. testified about Matthew’s murder, including the fact that M.T. could not see how Matthew died after the Defendant and James Nelson led Matthew away.
If not earlier, it is at least at this point in the record that another conflict beyond the economic resources of the IDB was apparent: antagonistic defenses. Nelson’s IDB counsel cross examined M.T., trying to elicit that Defendant was the one “giving orders” when Matthew was murdered. Notwithstanding that the defense strategies of Nelson and Defendant were plainly antagonistic, there is no indication in the record that the district court ever again raised the issue of whether additional counsel was needed to resolve any conflicts of interest. At the conclusion of the preliminary hearing, the district court found probable cause to hold all three men (the Defendant, the Defendant’s brother Danil Garcia, and James Nelson) on charges of first degree murder, aggravated rape, armed robbery, and second degree kidnap-ing. Afterwards, the cases against the three men were severed.[12]
|21In effect, during the February 21, 2006 preliminary hearing, the district court set a trajectory for representation by Eighteenth Judicial District IDB counsel and the use of that office’s resources during pretrial, trial preparation, and trial, and there was never a deviation from that trajectory after the legislative restructuring in August, 2007. This trajectory was set because the district court raised the issue of conflicts of interest, including conflicting allocation of resources, but the court inquired no further. As a result of this trajectory, the chief of the Eighteenth Judicial District IDB remained tasked by the district court with allocating the office’s resources among the three defendants and with determining whether additional counsel was necessary. No one (not the district court, not the chief of the IDB, nor Nelson’s counsel from all that appears here) ever inquired whether counsel from a “conflict panel” should be assigned, even after the legislative restructuring upon which the majority of this court relies.
Whether IDB counsel were conscious or not of the conflicting goals of their representation is beside the point here.[13] Still working, along the trajectory the district *59 court had set, the goals of counsel from the Eighteenth Judicial District IDB office clearly diverged, with one group of counsel attempting to prevent a death sentence for the Defendant, and another group brokering a deal for Nelson to serve as a key witness in the state’s effort to obtain the Defendant’s death sentence.
122This daunting scenario of the Eighteenth Judicial District IDB lawyers promoting conflicting strategies involving possible death penalties further confirms that the Holloway standard, under which the defendant need not prove his own counsel was adversely affected by a conflict,[14] is the appropriate standard of review for this capital case. “Holloway ... presumed ... that the conflict ... undermined the adversarial process.” Mickens, 535 U.S. at 168, 122 S.Ct. 1237. As the Court in Holloway itself observed: “[I]n a case of joint representation of conflicting interests the evil — it bears repeating — is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations.” Holloway, 435 U.S. at 490-91, 98 S.Ct. 1173. As noted earlier, because Defendant, Danil Garcia, and James Nelson all initially faced a potential death penalty and because the Eighteenth Judicial District IDB did not have a sufficient number of qualified capital defense attorneys, any plea agreement would provide an incentive for the IDB attorneys. For those attorneys, a plea agreement would avoid the difficult question of which defendant would be assigned qualified capital defense counsel. The adversarial system simply is not functioning properly if any incentive exists for defense counsel to determine whom among two or more defendants accused of the same capital crime is entitled to receive qualified capital defense counsel or, instead, which defendant(s) counsel must refrain from providing qualified capital defense counsel.
Lastly, I note that in Cisco, this court found that a conflict of interest required reversal of a murder conviction and death sentence when the defendant’s counsel also “represented [possibly] the most important witness in the State’s case.” Cisco, 01-2732 at 11 n. 15 & 25, 861 So.2d at 126 n. 15 & 135. The most significant Indifference between the goals of counsel in Cisco and the goals of counsel here is that the conflicting goals here are more obvious. Here, representing both the Defendant and James Nelson required pitting the word of one client against the other to show culpability for the very same capital crime.
VI. Conclusion
As odious as the crime here was to society, a court must nevertheless be resolute in ensuring the rules of engagement related to conflicted counsel are observed. The district court raised the issue of conflicted counsel, but neither resolved the issue nor pursued the issue. Consequently, attorneys associated with the same Indigent Defense Board were set to contrary tasks: one group attempted to spare the Defendant’s life; another group secured a deal with the state for Nelson to testify in aid of the state’s effort to put the Defendant to death.
Given the irrevocability of the penalty of death, this matter should be remanded for a new trial.
Thus, I respectfully dissent.

. Between the time of Defendant’s arrest and his trial, the laws governing the provision of legal services to indigent defendants in Louisiana were restructured. As part of this restructuring, the name "Indigent Defender Board” was changed to "Public Defender’s Office.” See generally, La. R.S. 15:141, et seq. (the "Louisiana Public Defender Act” enacted by 2007 La. Acts 307, § 1, effective August 15, 2007). The first name, “Indigent Defender Board” and its abbreviation "IDB” are used in this dissenting opinion for purposes of concision and simplicity. As discussed in this dissenting opinion, the majority does not point to any legally significant change to Defendant's representation as a result of the statutory restructuring, which occurred after Defendant’s indictment and after the conflicted trajectory was set.

. Just as the name "Indigent Defender Board” changed to "Public Defender's Office” with the enactment of the "Louisiana Public Defender Act” (La. R.S. 15:141, et seq.), Mr. D’Aquila's title changed from “Chief Indigent Defender” (Supp. R. Exh. 34) to "district public defender” or "chief indigent defender.” See La. R.S. 15:143. In this dissenting opinion, Mr. D'Aquila's title will be referred to simply as "chief” or "chief indigent defender.”

. This showing required of a defendant under Sullivan is different from the showing required under Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (requiring a demonstration of "a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different”). As explained in Mickens, 535 U.S. at 166, 122 S.Ct. 1237, cases marked by conflicts of interests present "circumstances of [sufficient] magnitude” such that the Supreme Court has "spared the defendant the need of showing probable effect upon the outcome.”

. According to the Mickens Court, even in cases where proof of the effect on a lawyer's representation is required, the defendant need not also show prejudice, because prejudice is presumed. Mickens, 535 U.S. at 173, 122 S.Ct. 1237.

. The duty this court described in Carmouche is neither novel, nor can it be said that its spirit is wholly confined to the jurisprudence. The duty described in Carmouche has an analogous statutory counterpart in La.C.Cr.P. art. 517, which provides:
A. Whenever two or more defendants have been jointly charged in a single indictment or have moved to consolidate their indictments for a joint trial, and are represented by the same retained or appointed counsel or by retained or appointed counsel who are associated in the practice of law, the court shall inquire with respect to such joint representation and shall advise each defendant on the record of his right to separate representation.
B. Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant’s right to counsel.
Here, Article 517 was technically not triggered because Defendant was not charged in the same indictment with Danil or Nelson. I cite the article as a statutory indicator of the pervasiveness of the duty to inquire regarding conflicts of interest.

.See Sullivan, 446 U.S. at 346, 100 S.Ct. 1708 ("[Tjrial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.”).

. Because rights deriving from both the state and federal constitutions are involved here, the joint representation occurring in this case is more appropriately examined according to the nationally-representative standards of the Restatement (Third) of Law Governing Lawyers, § 123 (2000). According to the Restatement, if one lawyer would be prohibited from representing multiple defendants, other lawyers would also be prohibited from representing multiple defendants when all the lawyers:
(1)are associated ... in rendering legal services to others through a law partnership, professional corporation, sole proprietorship, or similar association;
(2) are employed ... by an organization to render legal services either to that organization or to others to advance the interests or objectives of the organization; or
(3) share office facilities without reasonably adequate measures to protect confidential client information so that it will not be available to other lawyers in the shared office.
Id., at§ 123.

. ABA Model Rule 1.0(c) and Rule 1.0(c) of the La. Rules of Professional Conduct are identical, and provide:
*55 "Firm” or "law firm” denotes a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization.

. This statutory duty was enacted by the Louisiana Public Defender Act, 2007 La. Acts 307, and became effective on August 15, 2007, well before Defendant’s trial, which commenced on June 4, 2008. Thus, this is an example of a legislative change, overlooked by the majority of this court, that actually increased the problems plaguing the simultaneous representation of the Defendant and Nelson by lawyers of the Eighteenth Judicial District IDB.

. However, to reiterate, the touchstone for a group of lawyers to be construed as the equivalent of a law firm is that the lawyers are "associated,” which can occur whether or not those lawyers are technically under the same employment relationship. See La. Rules of Professional Conduct, Rule 1.10.

. In the year 2007, among the legislative reforms for the delivery of indigent defense services was a requirement that the newly created Louisiana Public Defender Board "[e]stablish[ ] policies and procedures for handling conflict of interest cases.” 2007 La. Acts 307, § 1, promulgating La. R.S. 15:148(B)(8).

. Before the Defendant’s trial, Danil proceeded to trial on charges of second degree murder, three counts of aggravated rape, armed robbery, and second degree kidnaping. After selection of the jury, Danil pled guilty to the second degree murder charge. In exchange, the state dismissed the remaining charges. Before sentencing, Danil filed a motion pro se to withdraw his guilty plea, which the district court denied. The district court sentenced Danil to serve life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The court of appeal affirmed in an unpublished opinion. State v. Garcia, 09-0177 (La.App. 1 Cir. 6/19/09), 11 So.3d 1246, and this court denied writs, State ex rel. Garcia v. State, 09-1804 (La.6/4/10), 38 So.3d 294.
In 2008, after Defendant’s trial, Nelson pled guilty to one charge of conspiracy to commit second degree murder, three counts of forcible rape, one count of second degree kidnap-ing, and one count of armed robbery. Nelson was ultimately sentenced to a total term of 60 years imprisonment at hard labor.

. Indigent Defender Board attorneys labor valiantly each day. The attorneys in this matter are no exception. This case is not about their efforts, rather, this case involves insuring that the system functions as it should, with each side represented by an attorney who is conflict-free from a legal standpoint.

. This situation points to an adverse impact. One example of an adverse impact is when "counsel was influenced in his basic strategic decisions.” Mickens, 535 U.S. at 172, 122 S.Ct. 1237, quoting Wood v. Georgia, 450 U.S. 261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).