FREDERICKA HOMBERG WICKER, Judge.
| ^Defendant appeals his convictions and sentences for second-degree murder. Defendant assigns as error the trial court’s admission of one victim’s statement made shortly after he was shot under the “excited utterance” exception to the hearsay exclusionary rule. Defendant further claims on appeal that he was denied effective assistance of trial counsel as the result of a conflict of interest that arose when his counsel was required to cross-examine a former client whose testimony was compelled by the state at trial.
For the reasons provided herein, we find that the trial judge did not abuse his discretion in finding that the victim’s statement, made within minutes of being shot, was admissible under the excited utterance exception to the hearsay exclusionary rule. We further find that defendant was not denied effective assistance of counsel at trial due to the alleged conflict of interest. The record supports a finding that no actual conflict existed when defense counsel was |3required to cross-examine a former client who was compelled to testify at trial. Defense counsel, an indigent defender for the Twenty-Fourth Judicial District Court, explained on the record that her representation of the witness was limited to a preliminary hearing in an unrelated matter that was dismissed prior to her representation of defendant in this case; that she did not get to “work with” the former client because the charges against him were dismissed; and that she did not recognize nor “know” the former client who was compelled to testify at trial. Thus, we find the record supports a finding that no actual conflict existed and, therefore, as to the allegations raised herein, defendant was not provided ineffective assistance of counsel at trial.
Because we find defendant’s assignments of error to be without merit, we affirm his convictions and sentences.

STATEMENT OF THE CASE

On June 4, 2009, a Jefferson Parish Grand Jury indicted defendant, Ross Kelly, with two counts of second-degree murder of Cleveland Randall and Rodney Senette. in violation of .La. R.S. 14:3o.!.[1] Defendant was arraigned and pled not guilty.
*869 On November 4, 2013, trial commenced and on November 7, 2013, a twelve-person jury unanimously found defendant guilty as charged as to both counts of second-degree murder.[2] On December 12, 2013, defendant was sentenced to two concurrent life sentences at hard labor without benefit of probation, parole, or suspension of sentence. Defendant filed a motion to reconsider sentences, which the trial court denied. This timely appeal follows.

J¿FACTUAL BACKGROUND

In the early morning hours of February 16, 2009, two groups of individuals exchanged gunfire between two houses located at 432 Federal Drive and 309 Deacon Street on the westbank of Jefferson Parish. Deputy Benjamin Green of the Jefferson Parish Sheriffs Office was the first officer to arrive to the scene at 432 Federal Drive, where reports had been made of two injured shooting victims. Upon his arrival, he observed one of the two reported shooting victims, Cleveland Randall, lying on the floor in the living room and the other victim, Rodney Senette, in the hallway bathroom vomiting blood. Cleveland[3] was pronounced dead at the scene and investigating officers were unable to communicate with him.[4] Deputy Green questioned Rodney as to his condition and the identity of the individual who shot him, to which he responded, “I’m good” and “[fit’s all good[,]” before becoming uncooperative. Rodney was transported to University Hospital, where he died six days later.[5]
Captain Don English of the Jefferson Parish Sheriffs Office testified that upon arrival to 432 Federal Drive, he determined that there were two scenes requiring investigation. ’ He assigned Lieutenant Terry Graffeo to investigate the Federal Drive scene while he took responsibility for the investigation of the Deacon Street scene. No weapons were recovered upon investigation of the interior and exterior of the scenes at 432 Federal Drive and 309 Deacon Street. However, numerous spent casings were recovered outside each residence.[6] At the Deacon Street scene, eighteen spent 7.62 assault rifle projectile casings were ^recovered from inside and outside the fenced area of the yard. A single .40 caliber shell casing was also recovered at that scene.[7] Lieutenant Graffeo testified that he recovered numerous 7.62 assault rifle spent projectile casings and .40 caliber spent casings from the exterior of the Federal Drive residence.[8]
*870 Colonel Timothy Scanlan was accepted as an expert in crime scene reconstruction, toolmark identification, and ballistics analysis. Colonel Scanlan testified that, considering the locations of the spent casings at the Deacon Street scene, he opined that the spread between the casings was consisr tent with at least one mobile shooter. He further testified that, based upon the presence of two different caliber casings, there were at least two shooters firing from 309 Deacon Street toward Federal Drive. He could not, however, rule out the possibility of a third shooter at the Deacon Street scene, considering that some weapons do not eject casings when fired. As to the Federal Drive scene, Colonel Scanlan also opined that there were at least two shooters standing at or near the front of the house at 432 Federal Drive firing towards Deacon Street.
Meredith Acosta, an expert in the testing and analysis of ballistic evidence, testified that she examined the casings recovered from the two scenes and concluded that the .40 caliber casings recovered at the Deacon Street and Federal Drive scenes came from two separate .40 caliber handguns and that the 7.62 caliber casings recovered from the Deacon Street and Federal Drive scenes were fired from two separate assault rifles.
Detective Jeffery Rodrigue of the Jefferson Parish Sheriffs Office testified that he arrived at the Federal Drive scene and was the case detective assigned to investigate the subject shootings. Pursuant to his investigation, Detective Rodrigue | ¿interviewed several witnesses who were present inside the Federal Drive residence at the time of the shootings. Based on the information gained from his numerous interviews, including the interview of Rachelle Senette (Rodney Senette’s sister), Detective Rodrigue developed three individuals as. suspects: Naron Becnel, Carlin Girod, and defendant.
Defendant was arrested on February 20, 2009. After being advised of his rights, he provided a verbal statement denying participation in the shootings and further stating that he was at a party at Linda Girod’s (then-suspect Carlin Girod’s sister) house on Betty Street in Marrero at the time of the shootings. Defendant told Detective Rodrigue that he, Naron Becnel, and Carlin Girod were all at the party on Betty Street and that all three of them remained at the party throughout the night.
Darrell Norman, a relative of the Sen-ette family, testified that in February of 2009 he was visiting from Texas and staying with the Senettes at their home located at 432 Federal Drive. On the night of the shootings, he went out to a night club with' some family members where he drank alcohol and took ecstasy. When he returned to the house at approximately 1:30 a.m., a large group of people sat around joking and “hanging out.” Among the group at the Federal Drive house that night were Brian McKeel, Rashaud Robinson, and the two victims, Cleveland and Rodney. Darrell testified that Brian was armed with an assault rifle and Rashaud was armed with a .40 caliber handgun. At one point, he observed Brian and Rashaud walk outside of the house, accompanied by Rodney and Cleveland. A short time later, Darrell testified that he heard “a whole lot of shots.” He then saw Rodney and Cleveland stumble into the house injured. Darrell used someone’s cell |7phone from inside the house and called 9 — 1—l.[9] Darrell testified that he saw Brian re-enter the house still in possession of a gun but that Brian and Rashaud were both gone when the police arrived.
*871 Scott Stein, a paramedic for West Jefferson Hospital, testified that he responded to the Federal Drive scene and tended to a gunshot victim identified as Rodney Senette. Mr. Stein testified that he transported Rodney to the hospital and that, upon questioning concerning the cause of his injuries, Rodney stated that he was outside of his house when he was shot and that he did not recall who shot him.[10] Wanda Haywood testified that at the time of the shooting she was living at 316 Deacon Street. She testified that when she heard gunshots outside, she looked out of her kitchen window and reported to the 9-1-1 operator that she saw “two black males,” “one running up Deacon” and one “jump out [of a] black Thunderbird.”[11]
Rachelle Senette, Rodney's sister, testified that she was asleep in her bedroom with Rickey McKeel (Brian’s brother) at the Federal Drive residence when she “heard an argument.” She explained that her friend, Richelle Williams (a.k.a. “Ruda”), was dating one of the victims, Cleveland (a.k.a. “Click”). When she got out of bed to see what was going on, she saw Ruda crying in one of the other bedrooms, Cleveland and Rodney sitting on the bed, and Rashaud standing by the door. According to Rachelle, Rashaud and Ruda were “yelling at each other,” because defendant had called Ruda’s cell phone. According to Rachelle, Ashan Celestine was the source of the tension that night between Ruda, Rashaud |8Cleveland, and Rodney, because she answered Ruda’s cell phone and revealed to everyone that defendant had called Ruda’s phone.[12]
The arguing eventually stopped and Rachelle returned to her bedroom. Rachelle was later awakened by gunfire. After the gunshots stopped, Rachelle testified that she ran out of her room and saw Cleveland lying on the floor. She then observed her brother Rodney walk into the house and tell his mother “I’m gonna be all right, ma. I got hit in my shoulders.”[13] According to Rachelle, Rodney then walked down the hallway, leaned his back against the wall, and slid down to the floor. When she asked “what happened?[,]” Rodney replied “Ross and them shot up our house.”[14]
*872 Ruda testified that she was at the Federal Drive residence on the night of the shootings. At some point in the evening, she allowed Ashan to borrow her cell phone. She testified that she later heard Ashan screaming “Ross is on the phone.” Ruda then saw Ashan giving the phone to Brian and Ruda immediately jumped up to get her phone back. Ruda then grabbed the phone, after which Brian and Rashaud began arguing with her regarding the way she was treating Cleveland, her boyfriend. Ruda testified that Cleveland then took her phone away and put it in his pocket.[15]
Ruda testified that she knew defendant because he had expressed a romantic interest in her. Ruda explained that Brian and defendant had both previously dated |3a girl named Chloe, and had had disagreements over her in the past.[16] Ruda stated that, after the disagreement over the cell phone call, she and Cleveland went back to her room. A short time later, Rashaud entered the room and stated that he needed to speak with Cleveland. Ruda testified that Cleveland left the room with Rashaud and shortly thereafter she heard the sound of gunfire.
Ashan was compelled to testify at trial. She admitted that she was at the Federal Drive residence on the night of the shootings. She further admitted that she borrowed Ruda’s cell phone that night and that, while she used Ruda’s cell phone, another call came in on the phone. At trial, she testified that she recalled telling the police in her statement that she answered the other call and stated, “Ross is on the phone.” At that point, she stated that “[t]hen Carlin jumped on the phone. You’re going to die. I’m going to kill you. You’re a stupid b* * *h.”
Ashan testified that, at some point, she went outside of the Federal Drive residence with Cleveland, Rodney, Rashaud, and Brian. While outside, she observed a gold car pass by the house several times. Although she testified at trial that she could not see who was inside the car, she previously told police in her statement that she saw the car pass and that Naron Bec-nel was driving, defendant was in the passenger seat, and Carlin Girod was in the backseat.[17] She testified that, after the car sped past a couple times, she became afraid and went back inside the house.
Roderick Senette testified that on the night of the shootings he was at the Federal Drive residence and observed that Ra-shaud was armed with a handgun, and Brian was armed with a “chopper.” Ty-marlous Norman, a thirteen-year old | mrelative visiting from out of town, also testified that he observed Brian in possession of an AK-47 and Rashaud in possession of a .40 caliber handgun at the Federal Drive residence on the night of the shootings.
Brian testified that he did not remember where he was on the night of the shooting. He denied knowing defendant or having ever spoken to him on the phone. Brian’s *873 brother, Rickey, testified that he does not know defendant and does not recall any fight that occurred over a cell phone call on the night of the shootings. He admitted that he, Rashaud, and his brother Brian were at the house on Federal Drive that night but stated that he was inside of the house in a bedroom with Rachelle when he heard gunshots fired. At trial, Rickey denied that he previously told police in a statement that his brother Brian called him and asked him to come to the house on Federal Drive that night because defendant and his friends were “about to come shoot up the place.”
Rashaud testified that he did not recall being at the Federal Drive residence at all in 2009. He further stated that he did not know defendant and that the first time he heard about the shootings on Federal Drive was when he was arrested in connection with this case for a charge of felon in possession of a firearm.[18] Rashaud denied being at the Federal Drive residence on the night of the shootings or seeing defendant pass by the house or shoot at him.
Linda Girod, Carlin Girod’s sister, testified that she is related to defendant. Linda testified that at one time defendant and Carlin lived together and that defendant, Carlin, and Naron associated with one another. She testified that on February 15, 2009, defendant, Carlin, and Naron came to her house on Betty Street in Marrero for a party. She stated that she was intoxicated at the party and fell |nasleep but was awakened in the middle of the night by the poliee at her door.[19] At trial, Linda testified that defendant was still at her home on her computer when the police came to her door in the middle of the night to investigate an unrelated matter.[20] However, she did recall at trial that she had previously given a statement to police two days after the subject shootings, informing officers that defendant left her house for the evening with Carlin and Nar-on at 10:00 p.m. on February 15, 2009, and that she did not see them again until 3:00 p.m. the following day. At trial, Linda explained that she told the police the three men had left her house at 10:00 p.m. because she is not permitted to have parties after 10:00 p.m. pursuant to her rental agreement.
Dwight Nichelson, custodian of records for the Sprint Corporation, testified that he provided telephone records for phone calls made from telephone number (504) 342-6714 (Ruda/Richelle Williams’ phone) and telephone records from telephone number (504) 402-9928 (Carlin Girod’s phone). Federal Bureau of Investigation Agent William Charles Williams, an expert in the field of historical cell site analysis, testified that Carlin’s cell phone was “hitting” off a cell phone tower near Linda Girod’s house between 5:41 p.m. and 9:30 p.m., on February 15, 2009, the evening prior to the shooting. Additionally, nine out of sixteen phone calls made on February 15, 2009, the day prior to the shootings, were made to Ruda’s cell phone. Further, an incoming call was received from Ruda’s cell phone at 11:51 p.m. on February 15, 2009.[21]
*874 Agent Williams also testified that Carlin’s cell phone traveled to the eastbank towards New Orleans East after 10:01 p.m. the night of February 15,11⅞2009 and did not return to the westbank of Jefferson Parish until 12:23 a.m. on February 16, 2009. Agent Williams testified that, minutes before the shooting incident, at 1:54 a.m., Carlin’s cell phone was hitting off the tower nearest to the scene of the Federal shooting. He further testified that Carlin’s phone definitively could not have been at the Betty Street address of Linda Gir-od’s home at 1:54 a.m. on February 16, 2009.

DISCUSSION

Defendant appeals his convictions and sentences. In this appeal, defendant assigns as error the trial court’s admission of Rodney’s statement made to his sister Rachelle following the shootings under the excited utterance exception to the hearsay exclusionary rule. Defendant further complains that he was denied effective assistance of conflict-free counsel at trial when his counsel was required to cross-examine a former client. We address each assignment of error in turn.

Admissibility of Rodney Senette’s Statement

Defendant complains on appeal that the trial judge erred in admitting Rodney’s statement, “Ross and them shot up our house[,]” under the excited utterance exception to the hearsay exclusionary rule. Defendant contends that the evidence does not show that Rodney made the statement under the immediate stress of the shooting event. He further asserts that Rodney’s statement is testimonial in nature and, thus, violates his constitutional right to confront his accuser. The state responds that the testimony and evidence presented at trial demonstrates that Rodney made the statement within seconds or minutes after he had been shot and clearly falls within the excited utterance exception to the hearsay rule. For the following reasons, we find that the trial judge did not abuse his discretion in admitting the statement at issue.
11?, Hear say is an out-of-court statement, other than one made by the declar-ant, offered to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay evidence is generally inadmissible unless otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. An “excited utterance,” defined as “[a] statement relating to a startling event or condition made while the declar-ant was under the stress of excitement caused by the event or condition!,]” is an exception to the hearsay exclusionary rule. La. C.E. art. 803(2). There are two requirements for the excited utterance exception to the hearsay rule to apply: (1) there must have been an event sufficiently startling to render a declarant’s normal reflective thought process inoperative, and (2) the statement must have been a spontaneous reaction to the event and not the result of reflective thought. State v. Henderson, 362 So.2d 1358, 1362 (La. 1978); State v. Ramirez, 09-350 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 844; State v. Hester, 99-426, p. 14 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 106.
The most important factor in determining whether a statement was made under the stress of a startling event is time. Id. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement expands beyond a description of events to include past or future facts, and “ ‘whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process.’ ” State v. Ramirez, 09-350 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 844, quoting State *875 v. Hilton, 99-1239 (La.App. 1 Cir. 3/81/00), 764 So.2d 1027, 1036, writ denied, 00-958 (La.3/9/01), 786 So.2d 113. A trial judge’s determination regarding admissibility of evidence will not be overturned on appeal absent a clear abuse of the trial judge’s discretion. State v. Odoms, 01-1033 (La. App. 5 Cir. |⅜43/26/02), 815 So.2d 224, 230-31, writ denied, 02-1185 (La.11/22/02), 829 So.2d 1037.
In the instant matter, on November 8, 2012, the state filed a “Notice of Intent to Introduce at Trial the Statements of Decedent Rodney Senette Prior to his Death.” The state argued that Rodney’s statement at issue — identifying “Ross” as the person who shot at him— constituted an excited utterance because it was made within minutes of the shootings. The state asserted that the 9-1-1 audio tape reveals the chaotic circumstances under which Rodney’s statement was made. Defendant responded that the statement was not an excited utterance because it was made in response to a question from his sister Rachelle. Defendant further contended that the statement was self-serving and thus, inadmissible because it was made shortly after Rodney engaged in an alleged argument with defendant, Carlin, and Naron.
On August 7, 2013, the trial court granted the state’s motion to admit Rodney’s statement, finding the statement admissible as an excited utterance exception to the hearsay rule. The trial court reasoned that the statement was made after a startling event and in such temporal proximity to the shootings that there was no chance for reflection or thought before the statement was made. The trial court also found that the substance of the statement pertained to the startling event in question and that it was made before the excitement of the event had subsided. In support of its finding, the trial court reasoned that the statement was made within minutes if not seconds of the shootings and that the 9-1-1 calls made after the shootings demonstrated the “pandemonium” occurring in the home following the shootings.
Upon review of the record in this matter, we find that the trial judge did not abuse his discretion in finding Rodney’s statement admissible under the excited |^utterance exception to the hearsay exclusionary rule. The 9-1-1 audio recording reflects the complete “pandemonium[,]” as accurately described by the trial judge, at the Federal Drive residence following the shootings. Further, Rachelle Senette testified that, upon hearing gunshots, she ran into the hallway where she observed Rodney actually walk into the home and walk toward the hallway. She observed Rodney enter thé house, lean his back against the •wall, and slide down to the floor. Rachelle then asked Rodney “what happened ... [?]” to which Rodney responded, “Ross and them shot up our house.” Based upon Rachelle’s testimony, it is reasonable to conclude that Rodney made this statement within minutes or possibly seconds after being shot and without the passage of sufficient time for reflective thought.[22]
Defendant next asserts that his constitutional right of confrontation was violated by the admission of Rodney’s statement. The Sixth Amendment to the United States Constitution and Article I, § 16 of *876 the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04), 885 So.2d 1118. Traditionally, for purposes of the Confrontation Clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement fell under a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.” State v. Smothers, 05-781 (La.App. 5 Cir. 3/28/06), 927 So.2d 484, 489, citing Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).
| lfiHowever, the United States Supreme Court in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), drew a distinction between testimonial and nontestimonial hearsay. The Court found that nontestimonial hearsay is admissible where both prongs of Roberts are satisfied. State v. Smothers, 05-781 at 10, 927 So.2d at 489. However, the Court further held that testimonial hearsay statements may only be admitted as evidence at a criminal trial when the declar-ant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. State v. Smothers, 05-781 at 10, 927 So.2d at 490.
Therefore, because the victim was clearly unavailable for trial and we have determined herein that his statement falls within a firmly rooted exception to the hearsay rule, we must then determine whether Rodney’s statement to Rachelle is “testimonial” hearsay. This Court has discussed testimonial statements and provided the following analysis:
[A]t a minimum testimonial statements include: “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations.” State v. Leonard, 05-42, p. 19 (La.App. 5 Cir. 7/26/05), 910 So.2d 977, 989, citing Crawford, supra, 124 S.Ct. at 1374. The Crawford Court stated that “testimony” is “[a] solemn declaration or affirmation made for the purpose, of establishing or proving some fact.” State v. Leonard, 05-42 at 19-20, 910 So.2d at 989, citing Crawford, supra, 124 S.Ct. at 1364. According to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not. Id. As examples of testimonial statements, the Crawford Court lists affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The Supreme Court also refers to statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
State v. Parks, 08-423 (La.App. 5 Cir. 11/25/08), 2 So.3d 470, 478, writ denied, 09-0142 (La.10/2/09), 18 So.3d 101.
| i7Under the facts of this case discussed above — -where the decedent Rodney made a statement to his sister moments after being shot and immediately prior to vomiting blood — we find that the statement was made without sufficient time for reflective thought and is not testimonial in nature. Thus, we find that the statement’s admission did not violate defendant’s constitutional right to confront his accuser. Accordingly, this assignment is without merit.

Ineffective Assistance of Counsel Claim

Defendant also claims on appeal that he was denied his constitutional right to conflict-free counsel. He argues that the trial court erred in permitting him to proceed *877 to trial with his attorney, Letita Davis, who had previously represented witness Rashaud Robinson in the defense of a pri- or criminal prosecution. Defendant asserts that an actual conflict arose when Davis was required to cross-examine Ra-shaud at trial, given the fact that Rashaud was potentially an armed participant in the instant shootings. Defendant further contends that the conflict was not cured by a valid waiver and that the error in permitting Davis to represent defendant was not harmless, mandating reversal of his convictions.
In response, the state contends that there was no conflict of interest because defense attorney Davis only represented Rashaud in her role as an indigent defender at a preliminary hearing in an unrelated matter. Further, the state maintains that because there was no actual conflict of interest, the trial court was not required to obtain a valid waiver of the alleged conflict. Alternatively, the state maintains that defendant validly waived his right to conflict-free counsel.
For the reasons provided herein, we find that no actual conflict of interest existed and, thus, defendant was not deprived of his constitutional right to conflict-free counsel.
118The United States Supreme Court and the Louisiana Supreme Court have thoroughly examined the relationship between conflicting interests and effective assistance of counsel. See Mickens v. Taylor, 535 U.S. 162,175,122 S.Ct. 1237,1245,152 L.Ed.2d 291 (2002); Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); State v. Wille, 595 So.2d 1149,1153 (La.1992), cert, denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992); State v. Carmouche, 508 So.2d 792, 797 (La.1987); State v. Edwards, 430 So.2d 60, 62-63 (La. 1983); State v. Marshall, 414 So.2d 684, 687-88 (La.1982), cert, denied, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982).
Under the Sixth Amendment to the United States Constitution, a defendant is entitled to assistance of counsel for his defense. U.S. Const. Amend. VI; State v. Franklin, 400 So.2d 616, 620 (La.1981); State v. Cisco, 01-2732 (La.12/3/03), 861 So.2d 118, 132, cert, denied, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004). To be more than just a hollow right, our law requires that assistance of counsel be effective. Thus, as a general rule, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant she is representing. Franklin, supra. Accordingly, the right to counsel secured under the Sixth Amendment includes the right to conflict-free representation. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); State v: Olivieri, 10-1064 (La.App. 5 Cir. 9/13/11), 74 So.3d 1191, unit denied, 11-2227 (La.2/17/12), 82 So.3d 283 (citing U.S. Const. Amend. VI and XIV; La. Const. Art. I, § 13; Franklin, 400 So.2d at 620).
After the trial court has been alerted that a potential conflict of interest exists, the judge must take the proper steps to assure that the defendant’s Sixth Amendment right to effective assistance of counsel is not violated. State v. Cisco, 01-2732 (La.12/3/03), 861 So.2d 118, 132, cert, denied, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004). When the issue of a conflict of interest is raised pre-trial, the trial judge is required to either appoint new counsel or take adequate steps to determine whether the risk of a conflict of interest is too remote to warrant other counsel. State v. Olivieri, 10-1064 (La. App. 5 Cir. 9/13/11), 74 So.3d 1191, 1193, writ denied, 11-2227 (La.2/17/12), 82 So.3d 283, referencing Holloway, supra. The *878 first step a trial judge must take is to require the attorney to disclose the basis of the conflict in order to determine if the conflict is too remote. Id.
In this case, the record illustrates that on September 3, 2013, defense counsel Davis disclosed the following information to the trial court:
DEFENSE COUNSEL:
Your Honor, I’d like to make a disclosure on the record to Mr. Kelly at this time that I previously represented Ra-shaud Robinson. And that was in Matter Number 07-6427, Division “0,” and that was just for a preliminary hearing. Those charges were subsequently refused against Rashaud Robinson. I do not know who Rashaud Robinson is. I don’t — since the charges were refused, I didn’t have an opportunity to work this case with him.
But this has come up, and I have explained to Mr. Ross Kelly that I had previously represented Mr. Robinson. And he has stated to me that he has no objection, that he will waive any conflict that may be apparent with me cross-examining Mr. Robinson in this case as a potential witness. The representation involving Mr. Robinson does not — did not — was not out of this case.
THE COURT: Right. It was another matter entirely.
DEFENSE COUNSEL: Correct. And it would not prevent me from cross-examining Mr. Robinson at all in this case, and I’d like Mr. Kelly to waive that representation on the record.
We find the above information provided by defense counsel is minimally sufficient to determine that no actual conflict of interest existed in this case. The 12flmere possibility of a conflict is insufficient to impugn a criminal conviction. Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708,1719, 64 L.Ed.2d 333 (1980). It is only when an actual conflict exists that the reversal of a conviction may be required. See Mickens v. Taylor, 535 U.S. at. 168, 122 S.Ct. 1237, citing Holloway, 435 U.S. at 481, 98 S.Ct. 1173. An actual conflict is defined as follows:
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
State v. Kahey, 436 So.2d 475, 484 (La. 1983), citing Zuck v. Alabama, 588 F.2d 436 (5th Cir.1979), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. State v. Olivieri, supra, citing Kahey, 436 So.2d at 484 (quotations omitted). The issue of conflicting loyalties “usually arises in the context of joint representation” but “can also arise where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney.” State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 125, citing State v. Kirkpatrick, 443 So.2d 546, 552 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984) (emphasis added).
First, we find that Rashaud Robinson, although compelled by the state to testify, did not testify against defendant at trial. Rather, he denied defendant’s involvement in the crime. Defendant argues on appeal that the alleged conflict adversely affected his counsel’s performance as evidenced by *879 his counsel’s failure to pursue a “viable defense strategy which cast blame upon Robinson as the shooter of Cleveland Randall” during cross-examination. The record reflects that, |21on direct examination, Rashaud testified that he knew nothing about the shooting incident and did not know defendant. Based on this favorable testimony, during cross-examination, Davis questioned Rashaud as to whether he was at the residence on Federal Drive on the night of the shootings and concerning the extent of his knowledge regarding the shootings. In response to Davis’ questions, Rashaud stated that he did not remember if he was at the house on Federal Drive on the night of the shootings, he did not see defendant there that night, he did not see defendant pass by the Federal Drive residence in any car, he never shot at defendant, and that defendant never shot at him. This favorable testimony was in direct support of defendant’s alibi theory of defense developed by his attorney Davis throughout the trial. To argue that a more effective theory of defense would have been to accuse Rashaud of committing the murder of Cleveland Randall rather than pursue an alibi defense, is neither plausible nor supported by the record. Defense counsel’s critical decision to rest defendant’s defense on an alibi theory appears, on its face, to be a reasonable tactical response to the circumstantial evidence presented by the state in this case.
Second, based upon the facts presented by defense counsel — that she represented Rashaud Robinson for a preliminary hearing in division “0” of the 24th Judicial District Court' where she is an indigent defender; that her representation was limited to one hearing; that she never worked with Rashaud Robinson because the charges were dismissed; and that she does not know who Rashaud Robinson is — we find that no actual conflict existed in this case.
The phrase “actual conflict of interest” means “precisely a conflict that affected counsel’s performance — as opposed to a mere theoretical division of 122loyalties.” Mickens, 535 U.S. at 171,122 S.Ct. at 1243.[23] An actual conflict of interest arises when a defense counsel is “put in the unenviable position of trying zealously to represent the defendant at trial while simultaneously trying to protect the confidences of a former client who was testifying for the state against the defendant.” State v. Bell, 04-1183 (La.App. 3 Cir. 3/2/05), 896 So.2d 1236, 1243, writ denied, 05-0828 (La.11/28/05), 916 So.2d 143, citing Carmouche, 508 So.2d at 804. The facts presented in this case do not show that defense counsel was forced to labor under an actual conflict with clearly divided loyalties. (Compare Cisco, 861 So.2d 118, in which the Louisiana Supreme Court reversed a defendant’s capital murder conviction and death sentence due to the fact that the defendant’s attorney was required to cross-examine the lead deputy sheriff investigator in defendant’s case, who was the state’s main witness, while simultaneously representing the deputy sheriff and his wife in unrelated family matters; and Carmouche, supra, wherein the Louisiana Supreme Court reversed the defendant’s conviction and sentence because the trial judge required the defendant’s counsel to cross-examine the state’s most damaging witness, who defense counsel simultaneously represented in another *880 matter — after defense counsel disclosed to the court that being forced to continue his representation would force him to zealously advocate for his client, the- defendant, while also maintaining confidences of his other client, the state’s most damaging witness, during cross-examination).
^Accordingly, for the reasons provided herein, we find that no actual conflict of interest arose in this case and that defendant’s assignment of error is without merit.[24]

ERRORS PATENT

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). The following errors were discovered upon review.
The State of Louisiana Uniform Commitment Order reflects the date of the offense as February 26, 2009; however, the indictment reflects that the date of the offense was actually February 16, 2009, and the record supports this date. Accordingly, we remand this matter for correction of the Uniform Commitment Order to reflect the accurate date of the offense. See State v. Lyons, 13-564, p. 9 (La.App. 5 Cir. 1/31/14), 134 So.3d 36 (citing State v. Long, 12-184, pp. 10-11 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142).
Second, although the commitment reflects that defendant was given a proper advisal of the time period for seeking post-conviction relief as required by La.C.Cr.P. art. 930.8, the transcript indicates an incomplete advisal. If a trial court fails to advise, or provides an incomplete advisal, pursuant to La.C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.
Accordingly, we hereby advise defen-. dant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of time appeal, shall be considered if it is filed more than two years after the [^judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.

CONCLUSION

Accordingly, for the reasons provided herein, defendant’s convictions and sentences are affirmed.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.

. Defendant was also indicted with one count of conspiracy to commit second-degree murder in violation of La. R.S. 14:26 and 14:30.1. This charge was severed prior to trial and, on February 4, 2014, the state dismissed the conspiracy charge. Two other individuals, Nar-on Becnel and Carlin Girod, were also named as co-defendants in the indictment. The charges against those individuals were nolle prosequied.

. Defendant subsequently filed a motion for new trial, which the trial court denied.

. The witnesses and victims will be referred to by their first names in this opinion for clarity due to the fact that many witnesses have the same last name.

. A gunshot residue test was performed on Cleveland Randall, which produced a negative result. Lieutenant Kevin Decker of the Jefferson Parish Sheriff's Office testified that the absence of gun powder residue on Cleveland’s hands did not necessarily mean that he had not handled a weapon that evening.

. While in the hospital, Rodney was unable to speak and was not made available for questioning due to his condition.

. Additionally, a projectile struck a residence at 312 Deacon Street, across the street from 309 Deacon Street, and was recovered. Richard Lampton and his wife, Belinda Lampton, testified that on the night of the shooting they were living at 312 Deacon and that a stray bullet struck their house.

. Lt. Graffeo testified that he also recovered one "live” or unspent 7.62 cartridge and one unknown caliber copper jacket from the exterior scene of Deacon Street.

. Captain English further testified that two vehicles that were parked in front of the residence at 436 Federal Drive — next door to the Federal Drive scene — had been struck by bullets.

. The 9-1-1 audio call was played for the jury.

. Specifically, in his report, Scott Stein noted the following: "[p]atient stated that he was outside above location with a second party when two other parties came up behind them and started shooting at them and that he did not recognize the other parties.”

. Ms. Haywood testified that she did not actually see the shots being fired but that she observed a black male sitting in the driver's seat of a black Thunderbird with the engine running.

. Darrell also testified that Rachelle later informed him that an argument had occurred that night between defendant and Ashan "and everybody on the phone.” Tymarlous Norman, another relative visiting from out-of-state, also testified that, earlier in the evening, there was an argument between Rashaud and an unknown individual after Rashaud took a cell phone away from Ashan.

. Catina Senette, Rodney’s mother, testified that she was sleeping at the time of the shootings. She walked into the living room and saw Rodney walk towards her to the hallway. She stated that Rodney told her he had been shot in the shoulders and she then saw blood start coming out of his mouth. She testified that she told Rodney not to move and that she then went back into her bedroom with some of the other children. She further testified that, although she heard “talk” about who was involved in the shootings, she never asked her son who shot him.

. Kerryoneia Norman testified that she was also staying at the Federal Drive residence on the night of the shootings and that she was awakened by the sound of gunfire. Kerryon-eia then left the bedroom and went into the kitchen where "everybody was screaming and hollering, and Cleveland was laying on the floor.” Kerryel Senette testified that Rodney was her brother and that she too was at the *872 Federal Drive residence on the night of the shooting. Kerryel was awakened by Kerryon-eia and when she walked out into the kitchen she saw Cleveland on the floor and Rodney "sliding down the wall.” She testified that she did not speak to Rodney.

. Investigating officers found Ruda’s cell phone inside Cleveland's pocket at the time of his death.

. In his verbal statement to police, defendant admitted that in the past he had problems with a man named Brian McKeel over an ex-girlfriend named Chloe, but denied any violence between them.

. Ashan further admitted that she identified defendant, Naron Becnel, and Carlin Girod in photographic lineups. At trial, Ashan admitted that she knew that Naron drove a car "like that” at the time of the shootings.

. That charge was subsequently dismissed by the state.

. She could not recall if defendant, Carlin Girod, and Naron Becnel were there when she fell asleep.

. According to Linda, the police were at her house looking for her father in an unrelated matter. Dispatch logs from the early morn-tag hours of February 16, 2009, indicate that at 4:12 a.m. (hours after the shooting incident) an officer reported to her home on Betty Street but that there was "no contact with the individual.”

. In his verbal statement to police, defendant denied that he used Carlin’s cell phone on the night of the shootings.

. Rachelle also testified that she and defendant were the closest of the eight siblings. The testimony presented at trial reflects that, upon paramedics' and officers’ arrival, several minutes after the shootings, Rodney did not provide the identity of the shooter. This arguably supports the state’s position that, in the heat and excitement of the minutes following the startling event (the shootings), Rodney told his closest sister what was happening in that moment without reflective thought.

. See also State v. Garcia, 09-1578 (La. 11/16/12), 108 So.3d 1, 33, cert, denied, - U.S. - , 133 S.Ct. 2863, 186 L.Ed.2d 926 (U.S.2013) for a recent Louisiana Supreme Court discussion of the seminal United States Supreme Court cases (Holloway, supra, Sullivan, supra, and Mickens, supra ) concerning actual conflicts of interest related to the issue of a defendant’s constitutional right to conflict-free counsel.

. Because we find no actual conflict of interest existed, we are not called upon to opine on the efficacy of the waiver in this case.